# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| CITY OF WEST SACRAMENTO, CALIFORNIA; and PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiffs,<br><br>    v.<br><br>R AND L BUSINESS MANAGEMENT, a California corporation, f/k/a STOCKTON PLATING, INC., d/b/a CAPITOL PLATING INC., a/k/a CAPITOL PLATING, a/k/a CAPITAL PLATING; CAPITOL PLATING, INC., a dissolved California corporation; at al.,<br><br>    Defendants. | No. 2:18-cv-00900 WBS EFB<br><br>MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS R AND L BUSINESS MANAGEMENT, JOHN CLARK, AND THE ESTATE OF NICK SMITH, DECEASED |

----oo0oo----

Plaintiffs City of West Sacramento, California ("the City") and the People of the State of California filed suit against Defendants R&L Business Management and John Clark (collectively referred to as "R&L"), the estate of Nick Smith, et al., to address toxic levels of soil and groundwater

1

contamination resulting from the release of hazardous substances at a property once occupied by a metal plating facility. Before the court is plaintiffs' motion for partial summary judgment against defendants R&L and Smith. (Docket No. 95.)

## I. Factual Background

During the 1940s, an automobile repair facility operated at operated at 319 3rd Street, West Sacramento, California (the "Property"). (Love. Decl. at 7.) Between 1940 and 1986, the Property was used for electroplating operations. (Defs.' Resp. to Pls.' Statement of Undisputed Facts ("Defs.' SUF") ¶ 70. A partnership of E. Birney Leland, Nick Smith, and Frank Rosen owned and operated Capitol Plating during the early 1960s. (Id. at ¶ 71.) The partnership dissolved in 1963. (Id. at ¶ 72.) Leland, Smith, and several others, including John Clark, formed Stockton Plating, Inc. in December 1963. (Id. at ¶ 73.) In 1973, Smith and Clark again took over Capitol Plating. Smith became president of Stockton Plating, Inc. and Clark took over as general manager of the facility. (Id.; Pls.' Mot. for Summ. J. at 12.)

The Capitol Plating facility primarily plated chrome bumpers. (Defs.' SUF ¶ 74.) The process for plating chrome on to bumpers consists of striping the bumper in acid or alkaline solutions to the bare metal. (Pls.'s Mot. for Summ. J., Ex. 13 at 1 (Docket No. 95-15).) Before plating, the metal may be ground and polished. (Id. at 2.) The surface is buffed after each plating operation and after the finish coat. (Id.) Each cycle involved the bumper being placed in a different tank of metal solution: first, copper; then, nickel; last, chromium.

(Id.; Pls.' Mot. for Summ. J. Ex. 2 (Dep. Richard Leland) at 63-64.)

For the plating and washing cycles, a worker would manually lift the bumpers, and move the bumpers between tanks containing either chemicals or plain water. (Dep. Richard Leland at 65-66.) The worker accomplished this by using two hooked rods to hook onto the bumper and leverage it in and out of the tank. (Id. at 64-65.) The bumper would be placed into a tank containing a metal solution and an electrical current would be applied to the tank. (Id. at 65-66.) The worker would then lift the bumper from the tank and move it to the next tank in the process. (Id.)

Due to the height of the tanks, an elevated duckboard floor was built so the workers could stand in the optimal position to lift and lower bumpers into the metal solutions. (Pls.' Mot for Summ. J., Ex. 1 (Dep. John Clark) at 84-85.) Duckboard consisted of two-by-fours with half-inch spacers set in a grid pattern on the floor to create an elevated platform approximately three feet high for the workers to walk on around the tank. (Id.) Any overflow from the tanks that fell through the duckboard to a floor drain connected to the sewer system. (Pls.' Mot. for Summ. J., Ex. 19 at 1; Decl. John Clark at 84 (Docket No. 95-3).) Overflow could result, for example, from bumper bolt holes holding liquid on the bumper's way out of the liquid and releasing it once the bumper was out of the liquid. (Dep. John Clark at 85-86.) The duckboard would get slippery with the water from the plating tanks. (Id. at 90.) The platers could then slip and drop the bumpers causing the contents of the

tank to splash outside of the tank. (Id.)

If the floor drain was unable to handle the volume of fluid, the plating fluids would flow out of the building through a hole in the wall or through the back door where they spill out onto the ground outside. (Dep. John Clark at 97-99.) When Clark started as the general manager of the Capitol Plating facility, he noticed that the ground outside the hole in the wall was colored blue, which suggests that acidic copper was present. (Dep. John Clark at 77 (Docket No. 95-3).) To prevent the solutions used in the metal plating process from escaping the building, Clark covered the hole in the wall with a dirt dam. (Id. at 82.; Decl. John Clark at ¶ 3 (Docket No. 102-3).) The dirt dam failed five to ten times before Clark decided to build a concrete barrier in the dam's place. (Dep. John Clark at 83.) When the dirt wall broke, rinse water containing diluted concentrations of plating fluids was likely released. (Defs.' Separate Statement at 3, ¶ 6 (Docket No. 102-2).) Clark then built a concrete wall to stop fluids from exiting the facility. (Decl. Adam Love at 15.)

The plating shop suffered two fires, one in 1973 and the other in 1985. Plating operations stopped in May of 1985. (Love Decl. at 8.) Capitol Plating used the property for storage of bumpers until 1991. (Id.) No business has operated out of the Property since then. (Id.)

In 1986, the California Department of Health Services launched an investigation on Capitol Plating after the Sacramento Bee reported that R&L was illegally dumping waste on the Property (the "Site"). (Defs.' Resp. to Pls.' SUF at 3, ¶ 2f.) The

Department investigated and took samples and pictures of the facility. (Id. at 3, ¶ 2g.) Later investigations at the Property showed soil and groundwater contaminated with various heavy metals including copper, chromium, and nickel at and emanating from the Property. (Decl. Anne Farr at 7-10 (Docket No. 95-27).) The levels of copper, nickel, and chromium at the Site exceed federal and state regulatory limits for both groundwater and soil. (Id.)

The City filed suit alleging, inter alia, violations of the Resource Conservation Recovery Act ("RCRA") §7002(a), 42 U.S.C. § 6972; the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") § 107(a), 42 U.S.C. § 9607(a), and the Gatto Act, Cal. Health & Safety Code §§ 25403.1, 25403.5. Plaintiffs also raise claims for public nuisance and declaratory relief. Plaintiffs now seek summary judgment on the issue of liability on each of these claims. (Docket No. 95.)

II. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that

negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the movant can demonstrate that the non-moving party cannot provide evidence to support an essential element upon which it will bear the burden of proof at trial. Id. Any inferences drawn from the underlying facts must, however, be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Under Fed. R. Civ. P. 56(g), if the court does not grant all of the relief requested by the motion, it may enter an order stating any material fact that is not genuinely in dispute and treat those facts as established in the case.

### III. Discussion

#### A. CERCLA Claim

"CERCLA was enacted in 1980 as a broad remedial measure aimed at assuring 'the prompt and effective cleanup of waste disposal sites' and ensuring that 'parties responsible for hazardous substance bore the cost of remedying the conditions they created.'" Adobe Lumber, Inc. v. Hellman, 658 F. Supp. 2d 1188, 1192 (E.D. Cal. 2009) (quoting Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1455 (9th Cir. 1986)). The Act holds owners and operators of facilities at which hazardous substances were disposed strictly liable. 3550 Stevens Creek Assocs. v. Barclays Bank of Cal., 915 F.2d 1355, 1357 (9th Cir. 1990). The Act does not "mandate 'joint and several liability' in every case." Burlington N. & Santa Fe Ry. Co. v. U.S., 556 U.S. 599, 613 (2009). When "there is a reasonable basis for determining

the contribution of each cause to a single harm," each defendant "is subject to liability only for the portion of the total harm that he has himself caused." Id. (quoting Restatement (Second) of Torts, § 433A).

To prevail in a private cost recovery action under CERCLA, a plaintiff must prove that "(1) the site on which the hazardous substances are contained is a 'facility' under CERCLA's definition of that term; (2) a 'release' or 'threatened release' of any 'hazardous substance' from the facility has occurred; (3) such 'release' or 'threatened release' has caused the plaintiff to incur response costs that were 'necessary' and 'consistent with the national contingency plan,'; and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a)." Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 870-71 (9th Cir. 2001) (internal citations omitted) (quoting Stevens Creek, 915 F.2d at 1358.

Defendants do not appear to seriously dispute that plaintiffs have established each of the elements above.[1] Defendants instead argue that the harm is divisible and that a divisibility defense may be invoked to defeat a motion for summary judgment on CERCLA liability. (Defs.' Opp. to Mot. Summ. J. at 8 (Docket No. 102).) For that proposition, defendants rely on United States v. Alcan Aluminum Corporation, 964 F.2d 252 (3d

---

[1] Although defendants appear to suggest that there was no release or that the release was insufficient, they do not further discuss the issue. See Defs.' Opp. to Mot. for Summ. J. at 6 ("Based on the evidence, R and L had, at most, five to ten releases through the hole in the back of the plating facility. (Love Dec.) There is no direct evidence of any releases by R and L other than those.").

7

Cir. 1992). Defendants argue that the court in <u>Alcan</u> evaluated the divisibility defense "just like any other affirmative defense" and that the Ninth Circuit has "implicitly adopted the Third Circuit's approach" to the defense in <u>Pakootas v. Teck Cominco Metals, Ltd.</u>, 905 F.3d 565, 587 (9th Cir. 2018). (Defs.' Opp. to Mot. Summ. J. at 9 (Docket No. 102).)

The court does not agree with defendants' interpretation of <u>Alcan</u>. In <u>Alcan</u>, the government filed a complaint against multiple defendants, including Alcan, to recover costs incurred in the cleanup of hazardous wastes released. <u>Alcan</u>, 964 F.2d at 257. The government settled with all defendants except Alcan. <u>Id.</u> The government then moved for summary judgment "to collect the balance of its response costs." <u>Id.</u> The district court granted the motion and "held that Alcan was jointly and severally liable for the removal costs." <u>Id.</u> Upon review, the Third Circuit found "error" in the district court granting summary judgment "<u>for the full claim</u> . . . without conducting a hearing." <u>Id.</u> at 269 (emphasis added). The Third Circuit then remanded the case for the district court to determine if Alcan could limit its liability based on its "personal contribution to the harm." <u>Id.</u> In other words, the Third Circuit reversed not because the harm was divisible, but rather because the district court <u>assumed</u> that the harm was not, and assigned full liability for the remaining costs. See id. at 270 ("Neither the magistrate judge nor the district court engaged in any factual investigation concerning the divisibility of the environmental harm."). <u>Alcan</u> does not stand for the proposition that divisibility precludes partial summary judgment on the issue

8

of liability. Instead, <u>Alcan</u> permits this court to find defendants liable under CERCLA and thereafter hold a hearing to determine the extent of defendants' contribution to the harm.

Further, even if the <u>Alcan</u> court interpreted divisibility to preclude summary judgment on the issue of liability, the Ninth Circuit did not adopt such an interpretation in <u>Pakootas</u>. In <u>Pakootas</u>, plaintiffs first moved for partial summary judgment on defendants' divisibility defense and the district court granted it. 905 F.3d at 573-74. Then, the district court "held that [defendant] was a liable party under [CERCLA]." <u>Id.</u> at 574. After holding that defendant was liable, the court then concluded "that without its divisibility defense, [defendant] was jointly and severally liable" for recovery costs. <u>Id.</u> The district court thus made three independent findings: (1) that the harm was not divisible; (2) that defendant was liable under CERCLA; and (3) that defendant was jointly and severally liable. Defendant appealed all three findings. <u>Id.</u> at 574.

Defendants are correct that the Ninth Circuit in <u>Pakootas</u> evaluated "how to review divisibility evidence on summary judgment." <u>Id.</u> at 588; <u>see</u> Defs.' Opp. to Mot. for Summ. J. at 9 (Docket No. 102). Defendants are incorrect, however, in concluding that the <u>Pakootas</u> court's evaluation of divisibility on summary judgment means divisibility can "defeat" a motion for summary judgment as to CERCLA liability. The court discussed divisibility on summary judgment because plaintiffs specifically moved for summary judgment on divisibility. 905 F.3d at 573-74. The court did not find, nor did it "implicitly adopt" the idea, that a finding of genuine issue of material fact as to

9

divisibility precludes a district court from finding a party liable under CERCLA. Indeed, the district court separated its finding of CERCLA liability from its finding on divisibility, and the Ninth Circuit evaluated each finding independently. The Ninth Circuit did not comingle the issues because a court can find that a party was both liable under CERCLA but not jointly and severally liable for all of the harm. See Burlington, 556 U.S. at 614 (distinguishing CERCLA liability from the "scope of liability"); Cal. Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d 930, 968 (E.D. Cal. 2003) ("[A] plaintiff 'bringing a cost recovery action ... must prove only that each defendant is a 'liable' party and not that defendants are responsible for a certain share of the plaintiff's response costs."). Accordingly, plaintiff is entitled to summary on the issue of liability on their CERCLA claim. Defendants are entitled to a hearing on the scope of that liability and the proportion of damages and costs they must bear.[2]

B. RCRA Claim

Section 6972(a)(1)(B) of the RCRA "permits a private party to bring suit against certain responsible persons, including former owners, "who ha[ve] contributed or who [are] contributing to the past or present handling, storage, treatment,

---

[2] The court makes no factual conclusions as to divisibility. No party has moved for summary judgment on the issue. Further, divisibility analysis is "factually complex," Alcan, 964 F.2d at 269, and apportionment methods "vary tremendously depending on the facts and circumstances of each case," Pakootas, 905 F.3d at 595. Those questions must be determined in a subsequent hearing.

10

transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." Meghrig v. KFC W., Inc., 516 U.S. 479, 484 (1996); 42 U.S.C.A. § 6972(a)(1)(B). Section 6972(a) authorizes district courts "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste ..., to order such person to take such other action as may be necessary, or both." 42 U.S.C.A. § 6972(a). To prevail on a claim under RCRA § 7002(a)(1)(B), a plaintiff must prove that (1) defendant "was a past or present generator or transporter of solid or hazardous waste or past or present owner or operator of a solid or hazardous waste treatment, storage or disposal facility"; (2) defendant "contributed to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste"; and, (3) "the solid or hazardous waste in question may present an imminent and substantial endangerment to health or the environment." Cal. Dep't of Toxic Substances Control, 298 F. Supp. 2d at 971; 42 U.S.C. § 6972(a)(1).

Defendants contest only the substantial and imminent endangerment element. As under plaintiffs' CERCLA claim, defendants also argue that the divisibility defense precludes summary judgment on this claim. Assuming, without deciding, that the divisibility defense applies here just as it applies under a CERCLA claim, for the reasons above, the court rejects the divisibility argument and evaluates only whether the waste may present an imminent and substantial endangerment.

1. Legal Standard

The RCRA authorizes injunctive relief where the site conditions "may present an imminent and substantial endangerment to health or the environment." Id. The language in the statute is "expansive." Lincoln Properties, Ltd. v. Higgins, No. CIV. S-91-760DFL/GGH, 1993 WL 217429, at *12 (E.D. Cal. Jan. 21, 1993) (quoting Dague v. City of Burlington, 935 F.2d 1343, 1355 (2nd Cir. 1991)). First, the word "may" precedes the standard of liability. This wording is intended "to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." Cal. Dep't of Toxic Substances Control, 298 F. Supp. 2d at 971 (quoting id.). Application of the statute is therefore not limited to emergency situations. Lincoln Properties, No. CIV. S-91-760DFL/GGH, 1993 WL 217429, at *12. Second, "endangerment" means "a threatened or potential harm and does not require proof of actual harm." Cal. Dep't of Toxic Substances Control, 298 F. Supp. 2d at 971 (quoting id.) Third, "a finding of 'imminence' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present." Id. (quoting Lincoln Properties, No. CIV. S-91-760DFL/GGH, 1993 WL 217429, at *13).

Finally, "'[s]ubstantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree) . . . endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of

12

a hazardous substance if remedial action is not taken." Id. (quoting Lincoln Properties, 1993 WL 217429, at *13). "Injunctive relief should not be granted," however, "'where the risk of harm is remote in time, completely speculative in nature, or de minimis in degree.'" Id. (quoting Lincoln Properties, 1993 WL 217429, at *13).

### 2. Application

The court finds a genuine issue of material fact as to whether the site conditions may present an imminent and substantial endangerment. Plaintiffs present evidence that the levels of copper, nickel, and chromium at the Site exceed state regulatory limits for both groundwater and soil. (Decl. Anne Far at 7-10). Dr. Farr, plaintiffs' expert, relies on the findings from three separate investigations conducted by Advanced GeoEnvironmental on behalf of Capitol Plating, concluding that the Site contained "hazardous levels of chromium, nickel, and copper." (Id. at 7.) Dr. Farr also cites two additional investigations concluding the same. (Id. at 7-8.) Defendants do not offer competing evidence on the level of contamination found on the Site nor do they dispute that the concentration of copper, nickel, and chromium exceed regulatory limits.

The crux of the issue, however, is whether this level of contamination constitutes an imminent and substantial endangerment. Dr. Farr concludes that such level of "contamination poses a threat to human health and the environment." (Decl. Anne Farr at 3 (Docket No. 95-27).) On the other hand, defendants argue that Dr. Farr relies on a Department of Toxic Substance Control (DTSC) report that was written but

13

never issued. (See id. at ¶ 25.) Plaintiffs argue that the lack of issuance does not mean that the Site is not an imminent and substantial endangerment. Id. at 5. The DTSC's refusal to conclude that the contamination may pose an imminent and substantial danger, however, competes with Dr. Farr's conclusion that the level of contamination does pose such a threat and suffices to find an issue of material fact.

Indeed, this court cannot conclude that the risk of harm is imminent and substantial merely because contamination levels exceed California regulatory standards. In Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199 (2d Cir. 2009), the Second Circuit refused to find an imminent and substantial endangerment where lead levels "exceeded Connecticut's [Remediation Standard Regulation] and [Significant Environmental Hazard] thresholds for residential sites," and plaintiff "dr[e]w the conclusion that lead contamination on the site presents 'a potential exposure risk to both humans and wildlife'" based "solely" on the contamination exceeding such regulatory thresholds. Id. at 212. Plaintiff's report specifically noted that "evaluation of the degree of such risk would require a further risk assessment" and did not suggest "that anyone is subject to long-term exposure to lead contamination . . . or that there are realistic pathways of exposure." Id.

Simsbury-Avon is instructive here. Every report Dr. Farr relies on (other than the DTSC report) concludes only that the contamination levels exceed California regulatory levels. Just as in Simsbury-Avon, however, Dr. Farr repeatedly qualifies

14

the conclusions of almost every report by stating that the full extent of contamination is unknown. (Decl. Anne Farr at ¶ 19; see also, e.g., id. at ¶ 21 ("The extent(s) of the constituents exceeding [Maximum Concentration Levels] were not defined."); id. at ¶ 23 ("Additional sampling . . . is necessary to fully evaluate the extent of contamination at and emanating from the Facility."); id. at 24 ("The full extent of the contamination has not yet been defined.").) Dr. Farr also does not conclude that anyone is subject to long-term exposure, or that they realistically will be exposed, to the contamination. In other words, Dr. Farr does not evaluate the risk at hand beyond the conclusion that the levels of contamination exceed California regulatory thresholds. "State standards do not define a party's federal liability under RCRA." Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 261 n.6 (3d Cir. 2005). This court therefore cannot conclude that the Site poses an imminent and substantial threat based only on the Site's noncompliance with California concentration limits.

### 3. Injunctive Relief

"Section 6972(a) authorizes district courts 'to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste ..., to order such person to take such other action as may be necessary, or both.'" Meghrig v. KFC W., Inc., 516 U.S. 479, 484 (1996). Because plaintiffs have not established all elements of the RCRA claim, the current state of the record does not support issuance of a mandatory injunction. See id.; see also LAJIM, LLC v. Gen Elec.

15

Co., 917 F.3d 933, 945 (7th Cir. 2019) ("A RCRA plaintiff either demonstrates irreparable harm or fails to prove his or her case on the merits."). Accordingly, plaintiffs' request for injunctive relief is denied.

IT IS THEREFORE ORDERED that plaintiff's motion for partial summary judgment on the issue of liability on their federal claim for violation of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") § 107(a) be, and the same hereby is GRANTED.

IT IS FURTHER ORDERED that plaintiffs' motion for summary judgment on their federal claim for violation of the Resource Conservation Recovery Act ("RCRA") §7002(a) be, and the same hereby is DENIED.

This matter is set for Status Conference on January 21, 2020, at 1:30 p.m., to discuss the scheduling of an evidentiary hearing to determine the scope and extent of defendants' liability and the proportionate share of the damages and cleanup costs to be borne by each defendant on the CERCLA claim. At such evidentiary hearing, the court will also hear the conflicting evidence on the RCRA claim and consider the supplemental state law claims. No later than ten court days before the Status Conference, counsel shall file a Joint Status Report which shall include suggested dates for the evidentiary hearing.

Dated: December 3, 2019

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE