1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10                                  ----oo0oo----

11

12  CITY OF WEST SACRAMENTO,                No. 2:18-CV-00900 WBS EFB
    CALIFORNIA; and PEOPLE OF THE
13  STATE OF CALIFORNIA,

14            Plaintiffs,                   MEMORANDUM AND ORDER RE:
                                           DEFENDANTS' DIVISIBILITY
15       v.                                DEFENSE

16  R AND L BUSINESS MANAGEMENT, a
    California corporation, f/k/a
17  STOCKTON PLATING, INC., d/b/a
    CAPITOL PLATING, INC., a/k/a
18  CAPITOL PLATING, a/k/a CAPITAL
    PLATING; CAPITOL PLATING, INC.,
19  a dissolved California
    corporation; ESTATE OF GUS
20  MADSACK, DECEASED; ESTATE OF
    CHARLES A. SCHOTZ a/k/a SHOTTS,
21  DECEASED; ESTATE OF E. BIRNEY
    LELAND, DECEASED; ESTATE OF
22  FRANK E. ROSEN, DECEASED; ESTATE
    OF UNDINE F. ROSEN, DECEASED;
23  ESTATE OF NICK E. SMITH,
    DECEASED; RICHARD LELAND, an
24  individual; SHARON LELAND, an
    individual; ESTATE OF LINDA
25  SCHNEIDER, DECEASED; JUDY GUESS,
    an individual; JEFFREY A. LYON,
26  an individual; GRACE E. LYON, an
    individual; THE URBAN FARMBOX
27  LLC, a suspended California
    limited liability company; and
28  DOES 1-50, inclusive,

                                       1

1

2                        Defendants.

3                              ----oo0oo----

4
5              Plaintiffs City of West Sacramento, California and the

6       People of the State of California (collectively, "plaintiffs")

7       brought this action to address toxic levels of soil and

8       groundwater resulting from the release of hazardous substances at

9       a property once occupied by a metal plating facility.

10      Plaintiffs' lawsuit involves the contamination at the property

11      located at 319 3rd Street in West Sacramento, California (the

12      "Site").  This court described much of the factual and procedural

13      background to this lawsuit in its prior orders.  (See Docket Nos.

14      18, 33, 44, 63, 115, & 125).

15             This court previously granted plaintiffs' motion for

16      partial summary judgment and found defendants R and L Business

17      Management ("R&L"), John Clark, and the Estate of Nick E. Smith

18      (collectively, "defendants") liable under the Comprehensive

19      Environmental Response, Compensation, and Liability Act

20      ("CERCLA"), 42 U.S.C. § 9607(a).  (Order at 10 (Docket No. 125).)

21      The court then set an evidentiary hearing to determine whether

22      defendants' contribution to the pollution at the Site is

23      divisible from the total contamination present at the Site (the

24      "divisibility hearing").  (Docket No. 129.)  The divisibility

25      hearing began on August 25, 2020 and lasted three days,

26      concluding on August 27, 2020.

27             At the hearing, defendants offered the testimony of

28      John Clark, the general manager who oversaw R&L's plating

                                      2

1    operations at the Site, and Richard Leland, the owner of R&L.

2    Defendants also offered the expert testimony of Dr. Adam Love.

3    Plaintiffs offered the testimony of Andrew Reimanis, a hazardous

4    substances engineer at the California Department of Toxic

5    Substances Control ("DTSC"), and Daniel Gallagher, a senior

6    engineering geologist at DTSC.  Plaintiffs also offered the

7    expert testimony of Dr. Anne Farr.

8         Based on this testimony and additional evidence

9    submitted by the parties, the court finds that the defendants

10   have not met their burden to prove divisibility and are therefore

11   jointly and severally liable for the harm caused to the Site.

12   This memorandum constitutes the court's findings of fact and

13   conclusions of law pursuant to Federal Rule of Civil Procedure

14   52(a).[1]

15   I.   Factual Background

16        A.   Background on the Site's Characteristics and Operations

17        The Site at issue is a relatively small parcel--

18   approximately 80x160 feet, or 0.3 acres--located in a portion of

19   West Sacramento zoned "Mixed-Use Neighborhood Commercial."

20   (Expert Report Dr. Adam Love, Ex. 3, at 5 ("Love Report") (Docket

21   No. 180-1)[2]; Tr. of Evidentiary Hr'g 531:7-9 ("Hr'g Tr.") (Docket

22   No. 200-202).)  The Site is bordered by property containing a

23   firehouse to the north, Third Street to the east, and largely

24   vacant lots to the south and west.  (See Love Report at 5.)  The

25        [1] The court expresses no opinion as to whether or to what

26   extend defendants may offset their liability by the liability of
     another in a subsequent contribution proceeding under CERCLA

27   section 113.  See 42 U.S.C. § 9613(f).

28        [2] All exhibit numbers refer to the parties' joint exhibit
     list for the divisibility hearing.

3

1    Site and the surrounding properties were originally developed on

2    top of imported fill material.  (Love Report at 10.)

3              Beginning in the 1930s, the Site was used for

4    residential purposes and then as a bus and automobile repair

5    facility until 1949.  (Id.)  Between 1949 and 1973, a series of

6    businesses performed vehicle electroplating operations on the

7    Site.  (Id.)  Operations largely took place in a single facility

8    that abutted the northern and western property lines.[3]  (See Ex.

9    23).  The remainder of the Site consisted of a drainage area in

10   the southwest corner and a driveway where workers would park in

11   the southeast corner.  (See id.)

12             Defendant R&L purchased the business operating on the

13   Site, Capitol Plating, in 1973.  (Id.)  At the time, R&L was

14   incorporated as "Stockton Plating, Inc."[4]  (Hr'g Tr. 139:7-

15   141:1.)  Stockton Plating continued the same type of

16   electroplating operations on the Site as Capitol Plating, and

17   even retained the business' name, until 1985.  (Id.)  From 1985

18   to 1991, defendants used the Site to store bumpers.  (Id.)  No

19   operations have occurred on the Site since 1991.  (Id.)

20        B.   Overview of Contamination at the Site

21             Various environmental consulting groups have conducted

22   environmental investigations at the Site since 1986, including

23   defendants' expert, who collected soil and groundwater data at

24   the Site in 2020 for the purposes of preparing a remedial cost

25   estimate for the Site.  (See Love Report; Expert Report of Dr.

26   _____

27        [3] This facility has since been demolished, but the concrete
     foundation is still present at the Site.  (See Ex. 7.)

28        [4] Defendant would later reincorporate as "R and L Business
     Management" in 1996.

1  Anne Farr, Ex. 1, at 7-16 ("Farr Report").)  Based on these

2  investigations, DTSC has determined that chromium, copper, lead,

3  nickel, and cadmium are present in Site soils at levels that

4  require remediation.  (Farr Report at 15.)  Samples from

5  monitoring wells and borings also show that groundwater at the

6  Site is contaminated with nickel, copper, chromium, and cadmium,

7  as well as a volatile organic compound ("VOC") known as 1,2-DCA.

8  (See, e.g., id. at 10.)

9       C.   Sources of Nickel, Copper, and Chromium Contamination

10           Electroplating operations at the Site have contributed

11  to the elevated levels and distribution of nickel, copper, and

12  chromium at the Site.  (See Farr Report at 16; Love Report at 12-

13  14.)  The process of electroplating objects like car bumpers is

14  likely to produce this type contamination because the process is

15  so reliant on liquid solutions containing metal.  (See Farr

16  Report at 16.)

17           Both defendants and previous electroplating businesses

18  at the Site primarily plated chrome bumpers.  (Id.)  The process

19  involved initially stripping away the bumper's plating down to

20  the bare metal using acid or alkaline solutions.  (Id.)  Any

21  damaged portions of the bumper were then ground, polished, and

22  straightened in two rooms located on the northeast corner of the

23  Site.  (Id.; Hr'g Tr. 110:23-112:1.)  Metal previously used to

24  plate the bumpers was released as particulates were ground off,

25  fell through the air, and settled on the ground.  (Hr'g Tr.

26  110:23-112:1).  Defendants and their predecessors gathered these

27  particulates with a dust collector or swept them up and

28  eventually placed them in a dumpster located in the southwestern

1  portion of the Site.  (Hr'g Tr. 77:14-78:11, 134:23-135:4; Ex.

2  23.)

3          Workers then placed the bumpers into tanks in the

4  facility's plating area that contained specific metal solutions--

5  first, copper; then, nickel; last, chromium--and applied an

6  electric current while they were submerged.  (Love Report at 6;

7  Ex. 23.)  A worker would manually lift each bumper by using two

8  hooked rods to leverage it in and out of the tank.  (Id.)

9  Workers also lowered the bumpers in and out of tanks containing

10  rinse water, and buffed the bumpers after each stage of the

11  plating operation and the finish coat.  (Id.)

12          Due to the height of the tanks, an elevated "duckboard"

13  floor was built in the plating area so the workers could stand in

14  the optimal position to lift and lower bumpers into the metal

15  solutions.  (Id. at 7.)  The duckboard consisted of two-by-fours

16  with half-inch spacers set in a grid pattern on the floor to

17  create an elevated platform approximately three feet high for the

18  workers to walk on around the tank.  (Id.)  Because of the space

19  between the two-by-fours, the duckboard permitted fluid falling

20  from above to fall directly onto the concrete floor below.  (Id.)

21  "Dragout" releases occurred when plating fluid or rinse water

22  would drip from the bumpers as they were pulled out of one tank

23  and moved into another.  (Rebuttal Expert Report of Dr. Farr, Ex.

24  5, at 7-11 ("Farr Rebuttal").)  These releases would not only

25  cause plating fluid or rinse water fluid to fall onto the

26  concrete, they would also cause the duckboard to get slippery and

27  wet.  (Id.)  Platers would sometimes slip, dropping the bumpers

28  and causing the contents of the tank to splash and fall onto the

1   ground.  (Id. at 9.)  Releases onto the concrete floor also

2   occurred when plating tanks leaked or holes developed due to

3   normal wear and tear, or when employees dropped the bumpers when

4   trying to move them from one tank to the next.  (Id. at 8-9.)

5           Any releases that reached the concrete floor in the

6   plating room would initially flow into a floor drain that

7   connected to a larger sewer system.  (Love Report at 7.)  When

8   the floor drain was unable to handle the volume of fluid

9   released, the plating fluids would flow out of the building

10  through a hole in the southern wall or through the back door

11  where they would spill out onto the ground outside.  (Id.)

12  Indeed, when Clark started as the general manager at the Capitol

13  Plating facility in 1973, he noticed that the ground outside the

14  hole in the wall was stained blue--evidence of releases of

15  liquids from the plating tanks and/or rinse tanks in the plating

16  room.  (Hr'g Tr. 49:15-50:12.)

17          Releases of metal plating wastes occurred in three

18  primary source areas.  (See Hr'g Tr. 251:7-253:7, 597:25-598:15;

19  Farr Report at 16.)  Plating operations released metals through

20  the footprint of the plating room and through the hole in the

21  southern wall of the plating process building into the parking

22  lot area. (Farr Report at 16.)  Releases also occurred in the

23  northeastern portion of the Site.  (Id.)

24      D.    Stockton Plating's Efforts to Prevent Releases

25          After Stockton Plating arrived at the Site in 1973, the

26  company made several operational and structural changes to try to

27  limit the number and magnitude of releases of plating metals to

28  the subsurface.  In 1973, Clark plugged the hole in the southern

1  wall of the plating facility with packed dirt to prevent releases

2  of plating fluid and rinse water from reaching the parking lot

3  area.  (Love Report at 7; Hr'g Tr. 56:15-57:5.)  Clark testified

4  that he recalled the earthen dam failing "five to ten" times

5  before he decided to replace it with a concrete retaining wall

6  that surrounded the wet plating operations the next year.  (Hr'g

7  Tr. 59:14-63:4; Farr Rebuttal at 6.)

8          Between 1973 and 1976, Stockton Plating also installed

9  a "counterflow" plumbing system and restrictor valves in the

10  rinse tanks, reduced overall water usage in the rinse tanks, and

11  installed racks above the plating tanks to reduce the number of

12  dragout and spillover releases from the tanks and pipe rinse

13  water directly into the sewer pump.  (Love Report at 14.)

14  II.  <u>Legal Standard</u>

15          Liability for potentially responsible parties under

16  CERCLA "is ordinarily joint and several, except in the <u>rare cases</u>

17  where the environmental harm to a site is shown to be divisible."

18  <u>Pakootas v. Teck Cominco Metals, Ltd.</u>, 905 F.3d 565, 588 (9th

19  Cir. 2018) (emphasis added); <u>see also</u> <u>Burlington N. & Santa Fe</u>

20  <u>Ry. Co. v. United States</u>, 556 U.S. 599, 614 (2009).  The

21  divisibility defense allows CERCLA defendants to avoid joint and

22  several liability by showing "that a reasonable basis for

23  apportionment exists."  <u>Burlington</u>, 556 U.S. at 614.

24          "The divisibility analysis involves two steps."

25  <u>Pakootas</u>, 905 F.3d at 588.  First, the court determines whether

26  the contamination at issue is "theoretically capable of

27  apportionment."  <u>Id.</u>  "Second, if the harm is theoretically

28  capable of apportionment, the fact-finder determines whether the

1  record provides a 'reasonable basis' on which to apportion

2  liability, which is purely a question of fact." Id.  If the

3  CERCLA defendant carries its burden, the court will apportion

4  liability among the responsible parties so that "each is subject

5  to liability only for the portion of the total harm that he has

6  himself caused." See id. (quoting United States v. Chem-Dyne

7  Corp., 572 F. Supp. 802, 810 (S.D. Ohio 1983)) (alteration

8  omitted).  Otherwise, the responsible parties will be held

9  jointly and severally liable so that "each is subject to

10  liability for the entire harm." Id. (quoting Chem-Dyne, 572 F.

11  Supp. at 810).

12      "[T]he defendant asserting the divisibility defense

13  bears the burden of proof" as to both elements of the defense.

14  Pakootas, 905 F.3d at 589; see also Burlington, 556 U.S. at 614.

15  "This burden is 'substantial' because the divisibility analysis

16  is 'intensely factual.'" Pakootas, 905 F.3d at 598 (quoting

17  United States v. Alcan Aluminum Corp., 964 F.2d 252, 269 (3d Cir.

18  1992)).  "The necessary showing requires a 'fact-intensive, site-

19  specific' assessment," id. at 589 (quoting PCS Nitrogen Inc. v.

20  Ashley II of Charleston LLC, 714 F.3d 161, 182 (4th Cir. 2013)),

21  "generating 'concrete and specific' evidence," id., 905 F.3d at

22  589 (quoting United States v. Hercules, Inc., 247 F.3d 706, 718

23  (8th Cir. 2001)).  While absolute certainty is not required, "the

24  defendant must show by a preponderance of the evidence--including

25  all logical inferences, assumptions, and approximations--that

26  there is a reasonable basis on which to apportion the liability

27  for a divisible harm." Id.

28      Apportionment under the divisibility defense is

1   "conceptually distinct from contribution or allocation of

2   damages."  Hercules, 247 F.3d at 718.  In a CERCLA §113(f)

3   contribution action, during "the allocation phase, the only

4   question is the extent to which a defendant's liability may be

5   offset by the liability of another; the inquiry at this stage is

6   an equitable one and courts generally take into account the so-

7   called 'Gore factors.'"  Id.; see also 42 U.S.C. § 9613(f)

8   (providing that a court "may allocate response costs among liable

9   parties using such equitable factors as the court determines are

10  appropriate") (emphasis added).  "The divisibility of harm

11  inquiry, by contrast, is guided not by equity--specifically, not

12  by the Gore factors--but by principles of causation alone."

13  Hercules, 247 F.3d at 718; see United States v. Rohm Haas Co., 2

14  F.3d 1265, 1280-81 (3d Cir. 1993); APL Co. Pte. Ltd. v. Kemira

15  Water Sols., Inc., 999 F. Supp. 2d 590, 624 (S.D.N.Y. 2014) ("The

16  divisibility doctrine is not a means by which courts allocate the

17  costs incurred in a cleanup and response operation among PRPs

18  [potentially responsible parties] on an equitable basis (i.e., on

19  the basis of relative fault).").  Instead, "equitable

20  considerations play no role in the apportionment analysis[.]"

21  PCS Nitrogen, 714 F.3d at 182 (quoting Burlington, 556 U.S. at

22  615 n.9).

23          Because courts must not consider equitable factors,

24  "where causation is unclear, divisibility is not an opportunity

25  for courts to 'split the difference' in an attempt to achieve

26  equity."  Hercules, 247 F.3d at 718.  "Rather, '[i]f they are in

27  doubt, district courts should not settle on a compromise amount

28  that they think best approximates the relative responsibility of

10

1  the parties.'  In such circumstances, courts lacking a reasonable

2  basis for dividing causation should avoid apportionment

3  altogether by imposing joint and several liability."  Id. at 718-

4  19 (citations omitted).

5  III. Discussion

6      A.    Whether the Contamination Is Theoretically Capable of
              Apportionment
7

8           Whether the environmental harm is theoretically capable

9  of apportionment "is primarily a question of law."  Pakootas, 905

10  F.3d at 588.  "Underlying this question, however, are certain

11  embedded factual questions that must necessarily be answered,

12  such as 'what type of pollution is at issue, who contributed to

13  that pollution, how the pollutant presents itself in the

14  environment after discharge, and similar questions.'"  Id.

15  (quoting NCR Corp., 688 F.3d at 838).  This is because "a court

16  cannot say whether a harm 'is, by nature, too unified for

17  apportionment' without knowing certain details about the 'nature'

18  of the harm."  Pakootas, 905 F.3d at 591.  "As one commentator

19  has explained: 'Even if a party's waste stream can be separately

20  accounted for, its effect on the site and on other parties'

21  wastes at the site must also be taken into account.'"  Id.

22  (quoting William C. Tucker, All Is Number: Mathematics,

23  Divisibility and Apportionment Under Burlington Northern, 22

24  Fordham Envtl. L. Rev. 311, 316 (2011)).  "That is, 'a defendant

25  must take into account a number of factors relating not just to

26  the contribution of a particular defendant to the harm, but also

27  to the effect of that defendant's waste on the environment.'"

28  Id.  "Those factors generally include when the pollution was

1  discharged to a site, where the pollutants are found, how the

2  pollutants are presented in the environment, and what are the

3  substances' chemical and physical properties."  Id.  "Chief among

4  the relevant properties are 'the relative toxicity, migratory

5  potential, degree of migration, and synergistic capacities of the

6  hazardous substances at the site.'"  Id. (quoting United States

7  v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d Cir. 1993)).

8          Moreover, "[f]or the purpose of apportioning CERCLA

9  liability, the relevant 'harm' is the entirety of contamination

10 at a site that has caused or foreseeably could cause a party to

11 incur response costs, suffer natural resource damages, or sustain

12 other types of damages cognizable under section 107(a)(4)."  Id.

13 at 592.  The defendant asserting the divisibility defense must

14 therefore produce evidence showing divisibility of the entirety

15 of contamination at a site, the harm caused by its wastes

16 combined with all other pollution, not just the harm caused by

17 its wastes alone.  Id. at 590-91.

18          Finally, the mixing of pollutants raises a rebuttable

19 presumption of indivisible harm.  Id. at 592-93.  This

20 presumption arises for pollutants that are physically

21 interspersed, not just those that are chemically commingled.  Id.

22 at 593.  "Even if pollutants do not chemically interact, their

23 physical aggregation can cause disproportionate harm that is not

24 linearly correlated with the amount of pollution attributable to

25 each source."  Id.  In other words, "the fact that a single

26 generator's waste would not in itself justify a response is

27 irrelevant . . . as this would permit a generator to escape

28 liability where the amount of harm it engendered to the

1   environment was minimal, though it was significant when added to

2   other generators' waste."   Id. (quoting Alcan, 964 F.2d at 264).

3          In this case, defendants' expert, Dr. Love, seeks to

4   determine defendants' contribution to the contamination at the

5   site by dividing the contaminants up three ways: geographically,

6   chemically, and volumetrically. (See Hr'g Tr. 250:13-251:6.)  He

7   then proposes a remedial plan that shows three distinct areas of

8   contamination, corresponding to the three primary source areas of

9   the releases at the Site.  (See Hr'g Tr. 250:13-253:7.)  Within

10  each of the three geographic areas, Dr. Love first looks to the

11  chemical nature of the contamination, concluding that because

12  defendants were not responsible for any lead releases at the

13  property, the plating metal contamination (i.e., nickel, copper,

14  and chromium) is divisible from the lead contamination. (See id.

15  at 258:1-24.)

16         Dr. Love then estimates the portion of the plating

17  metal contamination that the defendants contributed, using time

18  spent at the Site as a proxy for volume and considering the

19  improvements to the plating equipment and operations that

20  Stockton Plating made after arriving on the Site. (See id. at

21  259:17-262:2.)  Based on these estimates, Dr. Love calculates

22  that defendants should only be liable for 3.1% of the costs laid

23  out in his plan to remedy the Site's soil and 3.7% of the costs

24  to remedy the Site's groundwater.  (See id. at 296:3-24; Love

25  Report at 22-23.)

26         A fundamental problem with Dr. Love's analysis is that

27  it fails to take into account the impact of the ongoing

28  investigation by the DTSC.  Before any remedial plan can be

13

1  implemented it must be approved by the DTSC.  Michael Gallagher

2  is the DTSC hazardous substance engineer tasked with

3  investigating the Site and recommending a remedial plan.  He

4  testified at the hearing that the subsurface contamination at the

5  Site still has not been fully delineated.  (See id. at 466:14-23,

6  472:10-473:17.)  Based on his investigation of the Site to date,

7  Gallagher concludes that further sampling of soil and groundwater

8  beyond the property line to the southeast and the northeast is

9  needed to determine how far vertically and laterally chromium,

10 copper, nickel, and lead extend beyond the Site's property line.

11 (Id. at 489:23-490:3; Ex. 38 at 5.)

12       Gallagher also testified that it is impossible to know

13 whether Site groundwater contamination has been adequately

14 characterized, since reliable groundwater data has not been

15 collected since 2004 and the samples taken by Dr. Love were

16 biased.  (Hr'g Tr. 488:9-489:15, 490:16-25; Ex. 38 at 5.)

17 Because the full scope of the contaminant plume at the site is

18 still unknown, Gallagher has recommended to DTSC that it wait to

19 implement a remedial plan for the Site until additional

20 delineation of the contamination can be performed.  (Hr'g Tr.

21 473:5-17; Ex. 38 at 5.)  DTSC adopted Gallagher's recommendation

22 when it issued its imminent and substantial endangerment order.

23 (Hr'g Tr. 493:9-494:7.)

24       Thus, because Gallagher and (by extension, DTSC) is not

25 yet willing to approve a remedial plan for the Site, a percentage

26 cannot be accurate if the whole from which it is measured is not

27 known.  See Pakootas, 905 F.3d at 590-91 ("As a result, Teck was

28 required to produce evidence showing divisibility of the entire

14

1  harm caused by Teck's wastes combined with all other River
2  pollution--not just the harm from sources of Teck's six metals
3  alone." (emphasis added)).  Because the nature and extent of the
4  contamination at the Site have still not been fully defined, it
5  is entirely possible that further harm caused by Stockton Plating
6  beyond the property line or within it will be discovered.
7  Granting defendants' divisibility request based on Dr. Love's
8  analysis would leave the remaining defendants in the case holding
9  the bag for additional contamination or harm that was in fact
10 caused by Stockton Plating.

11       Considering all the evidence offered at the hearing,
12 the court is not convinced that Dr. Love's divisibility analysis
13 fully defines the contamination at the Site that will require
14 remediation.  Contamination that originated at the Site but has
15 since spread beyond the property line is part of the "relevant
16 harm" because it is foreseeable that it could cause a party to
17 incur response costs under CERCLA to remove it.  Pakootas, 905
18 F.3d at 591.  But testimony and reports by plaintiffs' expert,
19 Dr. Farr, as well as engineers at DTSC--the state regulatory
20 agency that will eventually have to review and approve a plan for
21 cleanup of the Site--indicate that the nature and extent of the
22 contamination at the Site, including how far the contamination
23 extends beyond the property line, has yet to be determined.  (See
24 Hr'g Tr. 549:11-551:21.)  Accordingly, Dr. Love's analysis fails
25 to satisfy defendants' burden of showing that the contamination
26 is theoretically capable of apportionment.

27       The trial court is given broad latitude in judging the
28 credibility of a witness and determining the weight to be given

1    to his testimony.  See Young Ah Chor v. Dulles, 270 F.2d 338, 341

2    (9th Cir. 1959).  Based upon the court's perception of the

3    witnesses at the evidentiary hearing and discrepancies between

4    Dr. Love's testimony and the evidence presented, the court finds

5    the testimony of Gallagher and Dr. Farr to be more credible than

6    that of Dr. Love.

7         Dr. Farr agrees that the full scope of the

8    contamination beyond the property lines to the southeast and

9    northeast remains undefined.  She testified that significant data

10   gaps remain for copper, chromium, and nickel soil concentrations

11   extending beyond the northeast and southeast property lines of

12   the Site, despite the amount of sampling that has taken place

13   over the years, including by Dr. Love.  (See Hr'g Tr. 473:5-17,

14   476:2-15; Ex. 2, fig.s 1, 5, 6.)  Similar data gaps exist with

15   respect to copper, nickel, and chromium concentrations in the

16   groundwater extending beyond the property line in all directions.

17   (See id., fig.s 7, 8, 9.)

18        Dr. Love also does not adequately account for the

19   uncertainty that remains surrounding the nature and extent of the

20   contamination at the Site.  He proposes a soil remedial scheme

21   that divides the Site into fourteen discrete "excavation areas,"

22   where the soil would be excavated and removed in volumes

23   determined according to the extent of metal contamination at that

24   location.  (See Hr'g Tr. 272:13-19; Love Report at 16-18; Ex. 4,

25   fig. 12.)  None of the excavation areas proposed for the

26   northeast corner of the Site extend beyond the property line,

27   despite the evidence showing that the contamination likely

28   spreads further out onto adjacent properties.  (Compare Ex. 4,

1   fig. 12 <u>with</u> Ex. 2, fig.s 1, 5, 6.)  And though the proposed

2   excavation area for the southeast corner of the Site does extend

3   onto the adjacent property, Dr. Love conceded on cross-

4   examination that additional investigation of the southeast corner

5   of the Site is still necessary to determine exactly how far

6   remediation there would need to extend.  (See Hr'g Tr. 332:19-

7   333:4.)  Absent an evaluation of the contamination as a whole,

8   the court cannot conclude that the harm is divisible.  <u>See</u>

9   <u>Pakootas</u>, 905 F. 3d at 594.

10        Moreover, Dr. Love fails to evaluate the contamination

11  beyond Stockton Plating's contribution to the pollution or the

12  additional impacts that mixing pollutants may have had, even in

13  the portions of the Site where the experts agree that the nature

14  and extent of the contamination is well-understood.  (<u>See</u> Hr'g

15  Tr. 473:5-17; 476:2-15.)  For instance, Dr. Love's groundwater

16  analysis does not adequately consider the impact of 1,2 DCA in

17  the groundwater.  He acknowledges the presence of 1,2 DCA at

18  unsafe levels, but his analysis does not provide enough

19  information to adequately assess current groundwater conditions

20  at the Site because it does not provide adequate field sampling

21  information for the data upon which the analysis relies or

22  indicate whether sampling wells were properly re-developed prior

23  to sample collection.  (Farr Report at 19-20; Ex. 38 at 5.)

24        Dr. Love also does not adequately evaluate the impact

25  of lead in the soil.  He concludes that the heightened lead

26  levels observed at the Site are due to fill material upon which

27  the Site was developed, not Stockton Plating's operations.  (Love

28  Report at 10-11; Farr Rebuttal at 3-4.)  Though plaintiff's

1    expert disputes this conclusion, (see Farr Rebuttal at 3-4), even

2    if the court assumes that Dr. Love is correct, his analysis

3    concedes that the lead is commingled and collocated with other

4    contaminants in the soil.  (See Love Report at 23; Hr'g Tr.

5    273:24-274:7.)   This type of commingling raises a rebuttable

6    presumption of indivisible harm.  Pakootas, 905 F. 3d at 594.

7    Yet Dr. Love makes no effort to rebut this presumption by showing

8    that lead does not chemically or physically interact with other

9    contaminants in the soil.  Id.; see also id. at 590-91 ("As a

10   result, Teck was required to produce evidence showing

11   divisibility of the entire harm caused by Teck's wastes combined

12   with all other River pollution--not just the harm from sources of

13   Teck's six metals alone.")

14          Dr. Love also dismisses the additional effects that

15   Stockton Plating's releases of plating metals may have had

16   through chemical or physical reactions with the plating metals or

17   other contaminants already present in the soil (often referred to

18   as "synergistic effects").  (See Farr Rebuttal at 12-13.)  He

19   acknowledges that the plating metals released by Stockton Plating

20   are commingled in the soil with plating metals released by prior

21   operators, but nevertheless concludes that the metals have not

22   produced any synergistic effects because they do not react

23   chemically with one another.  (See Hr'g Tr. 231:15-232:19.)  In

24   Pakootas, the court rejected a similar argument by the defendant:

25   "[e]ven if pollutants do not chemically interact, their physical

26   aggregation can cause disproportionate harm that is not linearly

27   correlated with the amount of pollution attributable to each

28   source."  Pakootas, 905 F.3d at 593.  Thus, even if Dr. Love is

1  correct in asserting that Stockton Plating's plating metals could

2  not have chemically interacted with metals released by prior

3  operators, his analysis is insufficient because it does not

4  address the potential exacerbating effects of physical

5  commingling between Stockton Plating's releases and plating

6  metals already present in the soil.   See id.

7          The court is persuaded by Dr. Farr's Rebuttal Report,

8  which points out that Dr. Love overlooked the potential for

9  releases from Stockton Plating's facility to drive metals already

10  in the soil deeper into the subsurface and into groundwater as

11  concentrations near the surface reached equilibrium.  (See Farr

12  Rebuttal at 12-13.)  The court therefore cannot conclude that the

13  impact of Stockton Plating's releases of additional copper,

14  nickel, and chromium into the soil or groundwater was linear.

15  See Pakootas, 905 F.3d at 593.

16          For these reasons, defendants have not established that

17  the entirety of the contamination is theoretically capable of

18  apportionment.

19      B.   Whether a Reasonable Basis for Apportionment Exists

20          Even if the contamination were theoretically capable of

21  apportionment, the defendants' claim of divisibility would still

22  fail because they have not put forward a reasonable basis for

23  apportionment.  In the second step of the divisibility analysis,

24  a CERCLA defendant must show that "there is a reasonable basis

25  for determining the contribution of each cause to a single harm."

26  Burlington, 556 U.S. at 614 (quoting Restatement (Second) of

27  Torts § 433A(1)(b)); Pakootas, 905 F.3d at 595.  "What is

28  reasonable in one case may not be in another, so apportionment

1   methods 'vary tremendously depending on the facts and

2   circumstances of each case.'"  Pakootas, 905 F.3d at 595 (quoting

3   Hercules, 247 F.3d at 717).  The basis for apportionment may rely

4   on the "simplest of considerations," most commonly volumetric,

5   chronological, or geographic factors.  Burlington, 556 U.S. at

6   617-18; Pakootas, 905 F.3d at 595.  "The only requirement is that

7   the record must support a 'reasonable assumption that the

8   respective harm done is proportionate to' the factor chosen to

9   approximate a party's responsibility."  Pakootas, 905 F.3d at 595

10  (quoting Restatement (Second) of Torts § 433A cmt. d).

11          Here, defendants argue that amount of contamination

12  attributable to defendants can be apportioned chemically,

13  geographically, and volumetrically.  For the following reasons,

14  none of these options provides a reasonable basis for

15  apportionment.

16              1.   Chemical Apportionment

17          Dr. Love concludes that soil contaminants at the Site

18  are readily distinguishable as metals originating from plating

19  operations (copper, nickel, and chromium) and metals originating

20  from fill material (lead).  (See Love Report at 20.)   In other

21  words, because Dr. Love concludes that all lead at the Site

22  originated from fill material, he apportions no responsibility or

23  cost for remediation to defendants for soil that contains only

24  lead, and apportions 50% responsibility for portions of soil that

25  contain lead and another metal originating from plating

26  operations.  (See id. at 23.)

27          Dr. Love's assumption that all lead at the Site must

28  originate with fill material is not based on site-specific data.

1  Rather it is based only on shallow soil samples collected at the

2  Firehouse Property north of the Site.  (Farr Rebuttal at 3.)  Dr.

3  Love provides no analysis to determine whether the elevated lead

4  concentrations in these shallow soil samples were also detected

5  in fill soils.  (Id.)  And, crucially, his analysis fails to

6  account for sampling in 2008 that failed to detect lead at

7  elevated concentrations in fill soils at the Site and to the east

8  of the Site.  (Id. at 4.)  If anything, the evidence tends to

9  show that one of the primary source areas for lead was the

10 parking lot located in the southeastern corner of the Site.

11 (Id.)  The elevated lead concentrations in this portion of the

12 Site are commingled and collocated with elevated chromium,

13 copper, and nickel, suggesting that Stockton Plating could have

14 been the source of at least some of the lead contaminants found

15 in the soil.  (See id.)  It is therefore not reasonable to assume

16 that defendant contributed 0% of the harm to soil contaminated

17 only with lead or even 50% of the harm to soil contaminated with

18 lead and one other metal.  See Burlington, 556 U.S. at 617–18;

19 Pakootas, 905 F.3d at 595.

20         2.  Geographic Apportionment

21         Dr. Love's analysis uses geographic location to try to

22 apportion fault by identifying three distinct areas of the Site

23 where plating metal contamination can be found: the plating

24 facility footprint, the southern rinse water drainage area, and

25 the northeast dumping area.  (See Love Report at 19.)  According

26 to the analysis, defendants cannot be held responsible for any of

27 the contamination in the northeast dumping area because all the

28 contaminants found there originate from fill material or dumping

21

1    of plating metals that occurred prior to Stockton Plating's

2    operations at the Site.  (See id. at 20.)

3          This attempt to apportion fault geographically ignores

4    evidence that Stockton Plating likely contributed to

5    contamination in the northeast corner of the Site.  Stockton

6    Plating's operations in the northeast corner of the Site included

7    grinding, straightening, and polishing chrome-plated bumpers.

8    (Hr'g Tr. 110:23-112:19; 115:22-116:17.)  This process resulted

9    in releases of copper, nickel, and chromium that fell through the

10   air and settled onto the ground.  (Id.)  Though these operations

11   took place indoors and above a concrete floor, two fires in 1973

12   and 1985 could have resulted in the release of particles outside

13   the building either directly or via firefighters' efforts to

14   douse the flames.  (Id. at 161:18-162:22.)  A major rain event in

15   the Sacramento area in 1986, after defendant had ceased

16   operations but before it had completely removed its chemicals and

17   equipment from the property, could have also spread metal

18   particles to the subsurface.  (See Ex. 52.)  In light of the

19   evidence of additional ways that releases of plating metals from

20   the northeast corner of the facility could have made their way to

21   the subsurface, the court cannot find that the record reasonably

22   supports an assumption that defendants are not responsible for

23   any of the harm to the northeastern portion of the Site.  See

24   Pakootas, 905 F.3d at 595.

25         In addition, Dr. Love gives the impression that the

26   geographic areas he defines would remain distinct throughout the

27   process of remediation.  (See Ex. 4, fig. 12.)  But as Dr. Love

28   conceded on cross-examination, the excavation areas his analysis

proposes would not remain separate and distinct once excavation
began.  (See Hr'g Tr. 342:1-343:20.)  The court is persuaded by
Dr. Farr's testimony and rebuttal report, which point out that
repeated releases over a period of years at a site this small are
likely to form "one big blob" in the soil.  (See Hr'g Tr. 531:23-
532:7, 625:3-626:24; Farr Rebuttal at 15.)  It is simply not
possible in this case to carve up the Site geographically into
separate and distinct portions that reflect the defendants'
"contribution . . . to a single harm."  Burlington, 556 U.S. at
614 (quoting Restatement (Second) of Torts § 433A(1)(b)).  There
is therefore no reasonable basis upon which to apportion the harm
geographically.

                    3.   Volumetric Apportionment

          Finally, Dr. Love attempts to apportion defendants'
contribution to the harm at the Site within the geographically
and chemically divisible areas in his analysis using a volumetric
approach.  (See Love Report at 20-22.)  Essentially, Dr. Love
calculates the relative amount of plating metals within the three
defined portions of the Site that Stockton Plating's operations
were responsible for, as compared to prior operators at the Site.
(See id.)

          To distinguish between releases attributable to
defendant and releases attributable to prior operators at the
Site, Dr. Love argues that the measures taken by Stockton Plating
shortly after it took over operations at the Site eliminated the
possibility of releases occurring through the hole of the
southern wall of the plating facility after 1974 or through the
footprint of the plating room after 1975.  (See Love Report at

14.)  He also concludes that any releases that occurred as
Stockton Plating was implementing these operational changes were
"minimal and incremental" compared to prior plating operations at
the Site.  (See id. at 14-15.)  Because neither defendants nor
prior operators kept adequate records to determine the specific
volume of plating fluids used at the Site, Dr. Love's analysis
uses time on the Site as a proxy for volume.  (Love Report at
20.)  Resting on the assumption that "the production volume of
the plating operations was fairly similar throughout the history
of Site operations," the analysis calculates that defendants only
contributed 3.1% of the harm to Site soil and 3.7% of the harm to
Site groundwater.  (Love Report at 20, 22-23.)

        The court cannot accept Dr. Love's attempt to apportion
fault volumetrically because his analysis relies on fundamentally
flawed assumptions and reaches conclusions that are belied by
evidence concerning Stockton Plating's operations and the nature
of the contamination at the Site.  See Burlington, 556 U.S. at
617-18; Pakootas, 905 F.3d at 595.  Dr. Love opines that any
discharges by the defendant prior to 1974 were minimal or
incremental, but his analysis does not mention the "five to ten"
known releases of plating metals that Stockton Plating's general
manager admitted occurred before he replaced the earthen dam with
the concrete retaining wall.  (Hr'g Tr. 57:16-25.)  Dr. Love also
provides no analysis or estimate of the volume of waste or
contaminant mass released through the hole in the southern wall
of the plating facility as a result of these known discharges.
(Farr Rebuttal at 6.)

        Dr. Love also assumes that the concrete retaining wall

24

1  prevented any liquid from migrating out of the plating area.

2  (Love Report at 14.)  While the wall likely reduced the amount of

3  releases that made their way outside the plating area, the court

4  is not convinced that it eliminated the risk entirely.  (See Farr

5  Rebuttal at 6.)  Dr. Farr's testimony confirms that the wall was

6  not designed to be impermeable to liquids.  (Hr'g Tr. 534:14-

7  535:4.)  Site inspections revealed cracks and erosion of the

8  concrete retaining wall as well as mineral discoloration,

9  indicating that liquids did in fact migrate through the concrete

10  wall during Stockton Plating's operations after 1974.  (Farr

11  Rebuttal at 7.)  Because the opening to the sewer was located

12  within the bounds of the retaining wall, any fluid that made it

13  beyond the retaining wall would likely have been released onto

14  the land south of the plating facility.  (Id.)

15         Dr. Love also assumes that Stockton Plating's

16  installation of racks above the plating tanks and improvements to

17  the rinse tanks' pipes eliminated the potential for releases to

18  occur from the plating room after 1975.  (Love Report at 14.)

19  This is contrary to testimony by Clark that the floor of the

20  plating room would still get wet as a result of plating

21  operations even after Stockton Plating installed the counterflow

22  and drainpipe systems.[5]  (Hr'g Tr. 119:22-120:4.)

23

24         [5] Dr. Farr's rebuttal report also relied on deposition
   testimony by Stockton Plating's own officers and owners
25  indicating that plating operations continued to cause discharges
   of plating liquids and rinse water onto the concrete floor after
26  Stockton Plating's improvements were put into place.  (Farr
   Rebuttal at 7-11.)  Deposition testimony by Leland specifically
27  showed that dragout releases continued to occur all the way up
   until plating operations at the Site ceased in 1985.  (Id.)
28

1    Even if Stockton Plating's improvements to its plating

2   equipment reduced the frequency with which releases occurred, it

3   strains credulity to believe that they eliminated the risk

4   completely.  (Id. at 9-10.)  And, contrary to Dr. Love's

5   assumption, a release onto the concrete floor or directly into

6   the sewer system would not necessarily prevent the plating metal

7   from reaching the subsurface.  Neither the concrete slab nor the

8   sewer system was completely impermeable to liquids; releases

9   therefore could have made their way through the concrete slab--

10   especially if there were joints or fractures in the floor--or

11   through joints and cracks in the sewer lines.  (Id. at 11-12;

12   Hr'g Tr. 534:14-535:4.)

13    Finally, Dr. Love's entire volumetric analysis rests on

14   the assumption that the production volume of plating operations

15   at the Site remained relatively constant from 1949 to 1975.  But

16   Clark and Leland's testimony tends to establish that business

17   increased during Stockton Plating's time at the Site.  (Hr'g Tr.

18   73:15-25, 99:19-101:21.)  Stockton Plating added a second 1,250-

19   gallon copper tank to the premises that allowed workers to plate

20   two bumpers simultaneously, and implemented efficiency

21   improvements that allowed the Site to process more bumpers each

22   shift.  (Id.)  Dr. Farr agreed that changes in the facility's

23   footprint indicated that production at the facility was likely

24   increasing over time.  (Hr'g Tr. 539:24-540:17, 561:8-19; Farr

25   Rebuttal at 14-18.)  While some evidence indicates that Stockton

26   Plating pursued increased "finished bumpers" business in the late

27   1970s that would have had little to no potential for releases of

28   plating metals, the weight of the evidence--much of it provided

26

1  by defendants' own managers and owners--indicates that operations

2  that carried a risk of releases increased over time at the Site.

3  Dr. Love's assumption that production stayed relatively constant

4  was therefore unreasonable.  See Pakootas, 905 F.3d at 595

5  (quoting Hercules, 247 F.3d at 717).

6        In summary, to accept Dr. Love's theory of volumetric

7  apportionment, the court would have to (1) accept that the memory

8  of Stockton Plating's general manager of events that occurred

9  almost 50 years ago is accurate and that there were only five to

10  ten releases of plating fluids at the Site in 1973, (2) assume

11  that these releases were de minimis, and (3) assume that the

12  structural and operational improvements defendants implemented

13  over the next two years prevented any releases of plating fluids

14  from reaching the subsurface, all while assuming, contrary to the

15  evidence, that operations at the Site remained relatively

16  constant over time.

17        Defendants essentially ask the court to stack

18  assumption on top of assumption to conclude that they should be

19  held liable for exactly 3.1% of the harm to Site soil and exactly

20  3.7% of the harm to Site groundwater.  (See Love Report at 20,

21  22-23.)  Because these assumptions run counter to the weight of

22  the evidence, defendants have not met the "substantial" burden of

23  showing a reasonable basis for determining their contribution to

24  the overall harm at the Site.  Pakootas, 905 F.3d at 598 (quoting

25  Alcan, 964 F.2d at 269).

26        IT IS THEREFORE ORDERED that the defendants' request

27  for a finding of divisibility be, and the same hereby is, DENIED.

28  The court hereby finds and declares as follows:

1.  Defendants have not met their burden of establishing
    that the contamination at the Site is theoretically
    capable of apportionment.

2.  Even if the contamination were theoretically capable of
    apportionment, defendants have not met their burden of
    establishing that there is a reasonable basis by which
    to determine their contribution to the overall harm.

3.  The CERCLA liability of Defendants R&L, John Clark, and
    the Estate of Nick E. Smith is not divisible from the
    total contamination present at the Site.

4.  Defendants R&L, John Clark, and the Estate of Nick E.
    Smith are therefore jointly and severally liable for
    the CERCLA violations that have occurred at the Site.

5.  The court expresses no opinion as to whether or to what
    extent defendants may offset their liability by the
    liability of another in a subsequent contribution
    proceeding under CERCLA section 113.

Dated:  September 16, 2020

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

28