UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF WEST SACRAMENTO, CALIFORNIA; and PEOPLE OF THE STATE OF CALIFORNIA, | Case No. 2:18-cv-00900-WBS-JDP |
| | **STIPULATED JUDGMENT** |
| *Plaintiffs,* | |
| *v.* | |
| R AND L BUSINESS MANAGEMENT, a California corporation, f/k/a STOCKTON PLATING, INC., d/b/a CAPITOL PLATING, INC., a/k/a CAPITOL PLATING, a/k/a CAPITAL PLATING; CAPITOL PLATING, INC., a dissolved California corporation; *et al.*, | |
| *Defendants.* | |
| AND RELATED CLAIMS. | |

Plaintiffs CITY OF WEST SACRAMENTO, CALIFORNIA (the "City") and PEOPLE OF THE STATE OF CALIFORNIA (the "People") (collectively the "Plaintiffs" or "the City and the People") and Defendants R AND L BUSINESS MANAGEMENT, formerly known as Stockton Plating, Inc. ("R&L"), JOHN CLARK ("Clark"), and ESTATE OF NICK SMITH, DECEASED ("Estate of Smith"), (collectively, "Defendants") (Plaintiffs and Defendants collectively, "Parties") have agreed to resolve the remaining issues between them in this action and have

1  agreed to entry by the Court of this Stipulated Judgment.

2         THEREFORE, pursuant to the stipulation of and on the joint motion of the Parties, it is

3  hereby ORDERED, ADJUDGED, AND DECREED as follows:

4         Plaintiff the City filed suit alleging claims under the Resource Conservation & Recovery

5  Act ("RCRA") § 7002(a)(1)(B), 42 U.S.C. § 6972, the Comprehensive Environmental Response,

6  Compensation & Liability Act ("CERCLA") § 107(a), 42 U.S.C. § 9607(a), the Gatto Act, Cal.

7  Health & Saf. Code §§ 25403.1, 25403.5, the Porter-Cologne Water Quality Control Act ("Porter-

8  Cologne Act"), Cal. Wat. Code § 13304(c), statutory indemnity pursuant to the Carpenter-

9  Presley-Tanner Hazardous Substance Account Act ("HSAA"), Cal. Health & Saf. Code §

10 26363(d), and declaratory relief under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), and the

11 Declaratory Judgment Act, 28 U.S.C. § 2201.[1] Plaintiffs also allege claims for abatement of a

12 public nuisance pursuant to Cal. Civ. Code §§ 3479, 3480, 3483, 3491(2) and Cal. Civ. Proc.

13 Code § 731.  Former defendants Richard Leland and Sharon Leland (now deceased) were

14 dismissed from the case following motions pursuant Fed. R. Civ. P. 12(b)(6) which the Court

15 granted.  (ECF Nos. 18, 44.)   The Third Amended Complaint (ECF No. 45) is Plaintiffs'

16 operative complaint.

17        Plaintiffs' suit relates to contamination at and emanating from a 0.3 acre parcel of real

18 estate located at 319 3rd Street, West Sacramento, California, identified by Assessor's Parcel

19 Number 010-371-03-01 (the "Property" and the entire area of contamination at and emanating

20 from the Property is referred to as the "Site").

21        Plaintiffs filed a motion for partial summary judgment on the issue of liability on the

22 RCRA, CERCLA, Gatto Act, public nuisance, and declaratory relief claims against Defendants.

23 The Court granted Plaintiffs' motion in part and denied it in part. The Court's ruling and analysis

24 are set forth in its order (ECF No. 125), which is attached hereto as Exhibit A and incorporated

25 herein by reference as though stated in full.

26 _____

27        [1] The City voluntarily dismissed its claims for ultrahazardous activity and trespass. In addition, the City and the People voluntarily dismissed their prayer for damages on their public nuisance claim.

28

The Court then held an evidentiary hearing on Defendants' divisibility defense to joint and several liability under CERCLA.  After that hearing, the Court found that Defendants had not met their burden to prove that the contamination was divisible and that Defendants were therefore jointly and severally liable for the contamination at the Site.  The Court's ruling and analysis are set forth in its order (ECF No. 203), which is attached hereto as Exhibit B and incorporated herein by reference as though stated in full.

Plaintiffs then filed a second motion for partial summary judgment against Defendants. With that motion, the City sought summary judgment as to liability on its Gatto Act claim against R&L and Estate of Smith and on its Porter-Cologne Act, public nuisance, HSAA, and declaratory relief claims against Defendants, and the People sought summary judgment as to liability on their sole cause of action—the public nuisance claim—against Defendants.  The Court granted Plaintiffs' motion in part and denied it in part. The Court's ruling and analysis are set forth in its orders (ECF Nos. 211 and 225), which are attached hereto as Exhibits C and D and incorporated herein by reference as though stated in full.

The Court subsequently entered an Amended Pretrial Order, which set out the issues left to be tried: the element of causation on the City's Porter-Cologne Act claim and Plaintiffs' public nuisance claims against Defendants; the imminent and substantial endangerment element on the City's RCRA claim against R&L and Estate of Smith; the amount of response costs that the City is entitled to recover from Defendants under CERCLA, the HSAA, the Porter-Cologne Act, and the Gatto Act; and the form of injunctive relief, if any, against Defendants that Plaintiffs may be entitled to under California public nuisance law and that the City may be entitled to under RCRA and the Gatto Act. The Court's order (ECF No. 252) is attached hereto as Exhibit E and incorporated herein by reference as though stated in full.

To avoid the time and expense of trial on the remaining issues cited above and to facilitate the final resolution of this action, the Parties stipulate, through their counsel, to entry of the following findings:

The conditions at the Site present or may present an imminent and substantial endangerment to health or the environment.

1    Defendants' conduct was a substantial factor in causing the nuisance and condition of

2    pollution or nuisance at the Site.

3    The City is entitled to judgment on its CERCLA and HSAA claims against Defendants.

4    The City is entitled to judgment on its RCRA and Gatto Act claims against R&L and Estate

5    of Smith.

6    The City is entitled to judgment on its Porter-Cologne Act claim against Defendants.

7    The City is entitled to judgment on its declaratory relief claim against Defendants.

8    Plaintiffs are entitled to judgment on their public nuisance claim against Defendants.

9    The City is entitled to recover from Defendants its past response costs in the sum of

10   $125,627.90.

11   The City is entitled to recover from Defendants any reasonable future response costs for the

12   Site it incurs with the oversight and approval of the Department of Toxic Substances Control

13   ("DTSC") consistent with the National Contingency Plan.

14   The City is entitled to recover from Defendants its reasonable attorneys' fees, expert

15   witness fees, and other litigation costs in the sum of $1,409,500.

16   THEREFORE, Judgment is entered: (1) in favor of the City on its CERCLA, Porter-

17   Cologne Act, public nuisance, and HSAA claims, and a declaration that the City is entitled to

18   recover from Defendants any reasonable future response costs for the Site it incurs with the

19   oversight and approval of DTSC consistent with the National Contingency Plan; (2) in favor of

20   the City on its RCRA and Gatto Act claims against R&L and Estate of Smith; and (3) in favor of

21   the City and the People of the State of California of the City of West Sacramento on the public

22   nuisance claim against R&L, Clark, and Estate of Smith.  The State of California is not a party to

23   this action or to this Stipulated Judgment.

24   Defendants are ordered to reimburse the City for its past response costs in the sum of

25   $125,627.90, and to reimburse the City for its reasonable attorneys' fees, expert witness fees, and

26   other costs of suit incurred in litigating this action in the sum of $1,409,500. The remaining

27   amount of the judgment against Defendants reflecting the estimated cost to remediate and obtain

28   regulatory closure of the Site shall not be stated in a sum certain, in part because the cost of the

1  remediation and regulatory closure of the Site is not known.

2      Defendants shall conduct a Site investigation to the satisfaction of DTSC.

3      Defendants shall perform those tasks listed within DTSC's I&S/E Order, Docket No. HSA-

4  FY 19/20-129, dated May 6, 2020, as it may be amended by DTSC, to the extent DTSC

5  determines that those tasks are needed, with the oversight and approval of DTSC.

6      Nothing contained in this Stipulated Judgment is intended to be given preclusive effect in a

7  subsequent claim or action filed by any third party, including but not limited to DTSC or any

8  similar governmental entity.

9

10      NOW, THEREFORE, IT IS SO ORDERED, ADJUDGED, AND DECREED.

11

12  Dated:  March 9, 2021

_____

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

13

14      IT IS SO STIPULATED.

15

16  Dated: March 4, 2021              PALADIN LAW GROUP® LLP

17                                By:  /s/  Bret A. Stone
                                     _____

18                                     Bret A. Stone

19                                     Special Assistant City Attorney
                                       for the City of West Sacramento

20                                     Counsel for Plaintiffs
21                                     City of West Sacramento and
                                       People of the State of California

22

23  Dated: March 4, 2021              LEWIS BRISBOIS BISGAARD & SMITH LLP

24                                By:  /s/  Joseph Salazar
25                                     _____

                                       Joseph Salazar
26
                                       Counsel for R and L Business Management, John
27                                     Clark, and the Estate of Nick Smith, Deceased

28

1

2   Dated: March 4, 2021                        CLYDE AND CO US LLP

3                                        By:   /s/  Alexander E. Potente

4                                               Alexander E. Potente

5                                               Counsel for Arrowood Indemnity Company,
                                                formerly known as Royal Insurance Company of
6                                               America, and successor to Royal Globe Insurance
                                                Company
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED JUDGMENT

# EXHIBIT A

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10                              ----oo0oo----

11

12   CITY OF WEST SACRAMENTO,              No. 2:18-cv-00900 WBS EFB
     CALIFORNIA; and PEOPLE OF THE
13   STATE OF CALIFORNIA,

14              Plaintiffs,              MEMORANDUM AND ORDER RE:
                                         PLAINTIFFS' MOTION FOR
15        v.                             SUMMARY JUDGMENT AGAINST
                                         DEFENDANTS R AND L BUSINESS
16   R AND L BUSINESS MANAGEMENT, a      MANAGEMENT, JOHN CLARK, AND
     California corporation, f/k/a       THE ESTATE OF NICK SMITH,
17   STOCKTON PLATING, INC., d/b/a       DECEASED
     CAPITOL PLATING INC., a/k/a
18   CAPITOL PLATING, a/k/a CAPITAL
     PLATING; CAPITOL PLATING, INC.,
19   a dissolved California
     corporation; at al.,
20
                Defendants.
21

22                              ----oo0oo----

23

24        Plaintiffs City of West Sacramento, California ("the

25   City") and the People of the State of California filed suit

26   against Defendants R&L Business Management and John Clark

27   (collectively referred to as "R&L"), the estate of Nick Smith, et

28   al., to address toxic levels of soil and groundwater

                                    1

1    contamination resulting from the release of hazardous substances

2    at a property once occupied by a metal plating facility.  Before

3    the court is plaintiffs' motion for partial summary judgment

4    against defendants R&L and Smith.  (Docket No. 95.)

5         I.   Factual Background

6         During the 1940s, an automobile repair facility

7    operated at operated at 319 3rd Street, West Sacramento,

8    California (the "Property").  (Love. Decl. at 7.)  Between 1940

9    and 1986, the Property was used for electroplating operations.

10   (Defs.' Resp. to Pls.' Statement of Undisputed Facts ("Defs.'

11   SUF") ¶ 70.  A partnership of E. Birney Leland, Nick Smith, and

12   Frank Rosen owned and operated Capitol Plating during the early

13   1960s.  (Id. at ¶ 71.)  The partnership dissolved in 1963.  (Id.

14   at ¶ 72.)  Leland, Smith, and several others, including John

15   Clark, formed Stockton Plating, Inc. in December 1963.  (Id. at ¶

16   73.)  In 1973, Smith and Clark again took over Capitol Plating.

17   Smith became president of Stockton Plating, Inc. and Clark took

18   over as general manager of the facility.  (Id.; Pls.' Mot. for

19   Summ. J. at 12.)

20        The Capitol Plating facility primarily plated chrome

21   bumpers.  (Defs.' SUF ¶ 74.)  The process for plating chrome on

22   to bumpers consists of striping the bumper in acid or alkaline

23   solutions to the bare metal.  (Pls.'s Mot. for Summ. J., Ex. 13

24   at 1 (Docket No. 95-15).)  Before plating, the metal may be

25   ground and polished.  (Id. at 2.)  The surface is buffed after

26   each plating operation and after the finish coat.  (Id.)  Each

27   cycle involved the bumper being placed in a different tank of

28   metal solution: first, copper; then, nickel; last, chromium.

2

1   (Id.; Pls.' Mot. for Summ. J. Ex. 2 (Dep. Richard Leland) at 63-
2   64.)

3          For the plating and washing cycles, a worker would
4   manually lift the bumpers, and move the bumpers between tanks
5   containing either chemicals or plain water.  (Dep. Richard Leland
6   at 65-66.)  The worker accomplished this by using two hooked rods
7   to hook onto the bumper and leverage it in and out of the tank.
8   (Id. at 64-65.)  The bumper would be placed into a tank
9   containing a metal solution and an electrical current would be
10  applied to the tank.  (Id. at 65-66.)  The worker would then lift
11  the bumper from the tank and move it to the next tank in the
12  process.  (Id.)

13         Due to the height of the tanks, an elevated duckboard
14  floor was built so the workers could stand in the optimal
15  position to lift and lower bumpers into the metal solutions.
16  (Pls.' Mot for Summ. J., Ex. 1 (Dep. John Clark) at 84-85.)
17  Duckboard consisted of two-by-fours with half-inch spacers set in
18  a grid pattern on the floor to create an elevated platform
19  approximately three feet high for the workers to walk on around
20  the tank.  (Id.)  Any overflow from the tanks that fell through
21  the duckboard to a floor drain connected to the sewer system.
22  (Pls.' Mot. for Summ. J., Ex. 19 at 1; Decl. John Clark at 84
23  (Docket No. 95-3).)  Overflow could result, for example, from
24  bumper bolt holes holding liquid on the bumper's way out of the
25  liquid and releasing it once the bumper was out of the liquid.
26  (Dep. John Clark at 85-86.)  The duckboard would get slippery
27  with the water from the plating tanks.  (Id. at 90.)  The platers
28  could then slip and drop the bumpers causing the contents of the

                                    3

1  tank to splash outside of the tank.  (Id.)

2        If the floor drain was unable to handle the volume of

3  fluid, the plating fluids would flow out of the building through

4  a hole in the wall or through the back door where they spill out

5  onto the ground outside.  (Dep. John Clark at 97-99.)  When Clark

6  started as the general manager of the Capitol Plating facility,

7  he noticed that the ground outside the hole in the wall was

8  colored blue, which suggests that acidic copper was present.

9  (Dep. John Clark at 77 (Docket No. 95-3).)  To prevent the

10  solutions used in the metal plating process from escaping the

11  building, Clark covered the hole in the wall with a dirt dam.

12  (Id. at 82.; Decl. John Clark at ¶ 3 (Docket No. 102-3).)  The

13  dirt dam failed five to ten times before Clark decided to build a

14  concrete barrier in the dam's place.  (Dep. John Clark at 83.)

15  When the dirt wall broke, rinse water containing diluted

16  concentrations of plating fluids was likely released.  (Defs.'

17  Separate Statement at 3, ¶ 6 (Docket No. 102-2).)  Clark then

18  built a concrete wall to stop fluids from exiting the facility.

19  (Decl. Adam Love at 15.)

20        The plating shop suffered two fires, one in 1973 and

21  the other in 1985.  Plating operations stopped in May of 1985.

22  (Love Decl. at 8.)  Capitol Plating used the property for storage

23  of bumpers until 1991.  (Id.)  No business has operated out of

24  the Property since then.  (Id.)

25        In 1986, the California Department of Health Services

26  launched an investigation on Capitol Plating after the Sacramento

27  Bee reported that R&L was illegally dumping waste on the Property

28  (the "Site").  (Defs.' Resp. to Pls.' SUF at 3, ¶ 2f.)  The

1  Department investigated and took samples and pictures of the

2  facility.  (Id. at 3, ¶ 2g.)  Later investigations at the

3  Property showed soil and groundwater contaminated with various

4  heavy metals including copper, chromium, and nickel at and

5  emanating from the Property.  (Decl. Anne Farr at 7-10 (Docket

6  No. 95-27).)  The levels of copper, nickel, and chromium at the

7  Site exceed federal and state regulatory limits for both

8  groundwater and soil.  (Id.)

9        The City filed suit alleging, inter alia, violations of

10  the Resource Conservation Recovery Act ("RCRA") §7002(a), 42

11  U.S.C. § 6972; the Comprehensive Environmental Response,

12  Compensation and Liability Act ("CERCLA") § 107(a), 42 U.S.C. §

13  9607(a), and the Gatto Act, Cal. Health & Safety Code §§ 25403.1,

14  25403.5.  Plaintiffs also raise claims for public nuisance and

15  declaratory relief.  Plaintiffs now seek summary judgment on the

16  issue of liability on each of these claims.  (Docket No. 95.)

17        II.  Legal Standard

18        Summary judgment is proper "if the movant shows that

19  there is no genuine dispute as to any material fact and the

20  movant is entitled to judgment as a matter of law."  Fed. R. Civ.

21  P. 56(a).  A material fact is one that could affect the outcome

22  of the suit, and a genuine issue is one that could permit a

23  reasonable jury to enter a verdict in the non-moving party's

24  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

25  (1986).

26        The party moving for summary judgment bears the initial

27  burden of establishing the absence of a genuine issue of material

28  fact and can satisfy this burden by presenting evidence that

1   negates an essential element of the non-moving party's case.

2   Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

3   Alternatively, the movant can demonstrate that the non-moving

4   party cannot provide evidence to support an essential element

5   upon which it will bear the burden of proof at trial.  Id.  Any

6   inferences drawn from the underlying facts must, however, be

7   viewed in the light most favorable to the party opposing the

8   motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

9   U.S. 574, 587 (1986).

10          Under Fed. R. Civ. P. 56(g), if the court does not

11  grant all of the relief requested by the motion, it may enter an

12  order stating any material fact that is not genuinely in dispute

13  and treat those facts as established in the case.

14          III.    Discussion

15          A. CERCLA Claim

16          "CERCLA was enacted in 1980 as a broad remedial measure

17  aimed at assuring 'the prompt and effective cleanup of waste

18  disposal sites' and ensuring that 'parties responsible for

19  hazardous substance bore the cost of remedying the conditions

20  they created.'"  Adobe Lumber, Inc. v. Hellman, 658 F. Supp. 2d

21  1188, 1192 (E.D. Cal. 2009) (quoting Mardan Corp. v. C.G.C.

22  Music, Ltd., 804 F.2d 1454, 1455 (9th Cir. 1986)).  The Act holds

23  owners and operators of facilities at which hazardous substances

24  were disposed strictly liable.  3550 Stevens Creek Assocs. v.

25  Barclays Bank of Cal., 915 F.2d 1355, 1357 (9th Cir. 1990).  The

26  Act does not "mandate 'joint and several liability' in every

27  case."  Burlington N. & Santa Fe Ry. Co. v. U.S., 556 U.S. 599,

28  613 (2009).  When "there is a reasonable basis for determining

1    the contribution of each cause to a single harm," each defendant

2    "is subject to liability only for the portion of the total harm

3    that he has himself caused."  Id. (quoting Restatement (Second)

4    of Torts, § 433A).

5         To prevail in a private cost recovery action under

6    CERCLA, a plaintiff must prove that "(1) the site on which the

7    hazardous substances are contained is a 'facility' under CERCLA's

8    definition of that term; (2) a 'release' or 'threatened release'

9    of any 'hazardous substance' from the facility has occurred; (3)

10   such 'release' or 'threatened release' has caused the plaintiff

11   to incur response costs that were 'necessary' and 'consistent

12   with the national contingency plan,'; and (4) the defendant is

13   within one of four classes of persons subject to the liability

14   provisions of Section 107(a)."  Carson Harbor Vill., Ltd. v.

15   Unocal Corp., 270 F.3d 863, 870-71 (9th Cir. 2001) (internal

16   citations omitted) (quoting Stevens Creek, 915 F.2d at 1358.

17        Defendants do not appear to seriously dispute that

18   plaintiffs have established each of the elements above.[1]

19   Defendants instead argue that the harm is divisible and that a

20   divisibility defense may be invoked to defeat a motion for

21   summary judgment on CERCLA liability.  (Defs.' Opp. to Mot. Summ.

22   J. at 8 (Docket No. 102).)  For that proposition, defendants rely

23   on United States v. Alcan Aluminum Corporation, 964 F.2d 252 (3d

24   _____

25        [1]   Although defendants appear to suggest that there was no
     release or that the release was insufficient, they do not further
26   discuss the issue.  See Defs.' Opp. to Mot. for Summ. J. at 6
     ("Based on the evidence, R and L had, at most, five to ten
27   releases through the hole in the back of the plating facility.
     (Love Dec.) There is no direct evidence of any releases by R and
28   L other than those.").

                                   7

1    Cir. 1992).  Defendants argue that the court in Alcan evaluated

2    the divisibility defense "just like any other affirmative

3    defense" and that the Ninth Circuit has "implicitly adopted the

4    Third Circuit's approach" to the defense in Pakootas v. Teck

5    Cominco Metals, Ltd., 905 F.3d 565, 587 (9th Cir. 2018).  (Defs.'

6    Opp. to Mot. Summ. J. at 9 (Docket No. 102).)

7         The court does not agree with defendants'

8    interpretation of Alcan.  In Alcan, the government filed a

9    complaint against multiple defendants, including Alcan, to

10   recover costs incurred in the cleanup of hazardous wastes

11   released.  Alcan, 964 F.2d at 257.  The government settled with

12   all defendants except Alcan.  Id.  The government then moved for

13   summary judgment "to collect the balance of its response costs."

14   Id.  The district court granted the motion and "held that Alcan

15   was jointly and severally liable for the removal costs."  Id.

16   Upon review, the Third Circuit found "error" in the district

17   court granting summary judgment "for the full claim . . . without

18   conducting a hearing."  Id. at 269 (emphasis added).  The Third

19   Circuit then remanded the case for the district court to

20   determine if Alcan could limit its liability based on its

21   "personal contribution to the harm."  Id.  In other words, the

22   Third Circuit reversed not because the harm was divisible, but

23   rather because the district court assumed that the harm was not,

24   and assigned full liability for the remaining costs.  See id. at

25   270 ("Neither the magistrate judge nor the district court engaged

26   in any factual investigation concerning the divisibility of the

27   environmental harm.").  Alcan does not stand for the proposition

28   that divisibility precludes partial summary judgment on the issue

1   of liability.   Instead, Alcan permits this court to find

2   defendants liable under CERCLA and thereafter hold a hearing to

3   determine the extent of defendants' contribution to the harm.

4          Further, even if the Alcan court interpreted

5   divisibility to preclude summary judgment on the issue of

6   liability, the Ninth Circuit did not adopt such an interpretation

7   in Pakootas.   In Pakootas, plaintiffs first moved for partial

8   summary judgment on defendants' divisibility defense and the

9   district court granted it.   905 F.3d at 573-74.   Then, the

10  district court "held that [defendant] was a liable party under

11  [CERCLA]."   Id. at 574.   After holding that defendant was liable,

12  the court then concluded "that without its divisibility defense,

13  [defendant] was jointly and severally liable" for recovery costs.

14  Id.   The district court thus made three independent findings: (1)

15  that the harm was not divisible; (2) that defendant was liable

16  under CERCLA; and (3) that defendant was jointly and severally

17  liable.   Defendant appealed all three findings.   Id. at 574.

18          Defendants are correct that the Ninth Circuit in

19  Pakootas evaluated "how to review divisibility evidence on

20  summary judgment."   Id. at 588; see Defs.' Opp. to Mot. for Summ.

21  J. at 9 (Docket No. 102).   Defendants are incorrect, however, in

22  concluding that the Pakootas court's evaluation of divisibility

23  on summary judgment means divisibility can "defeat" a motion for

24  summary judgment as to CERCLA liability.   The court discussed

25  divisibility on summary judgment because plaintiffs specifically

26  moved for summary judgment on divisibility.   905 F.3d at 573-74.

27  The court did not find, nor did it "implicitly adopt" the idea,

28  that a finding of genuine issue of material fact as to

9

divisibility precludes a district court from finding a party liable under CERCLA.   Indeed, the district court separated its finding of CERCLA liability from its finding on divisibility, and the Ninth Circuit evaluated each finding independently.   The Ninth Circuit did not comingle the issues because a court can find that a party was both liable under CERCLA but not jointly and severally liable for all of the harm.   See Burlington, 556 U.S. at 614 (distinguishing CERCLA liability from the "scope of liability"); Cal. Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d 930, 968 (E.D. Cal. 2003) ("[A] plaintiff 'bringing a cost recovery action ... must prove only that each defendant is a 'liable' party and not that defendants are responsible for a certain share of the plaintiff's response costs."").   Accordingly, plaintiff is entitled to summary on the issue of liability on their CERCLA claim.   Defendants are entitled to a hearing on the scope of that liability and the proportion of damages and costs they must bear.[2]

> B.   RCRA Claim

Section 6972(a)(1)(B) of the RCRA "permits a private party to bring suit against certain responsible persons, including former owners, "who ha[ve] contributed or who [are] contributing to the past or present handling, storage, treatment,

_____

[2]    The court makes no factual conclusions as to divisibility.   No party has moved for summary judgment on the issue.   Further, divisibility analysis is "factually complex," Alcan, 964 F.2d at 269, and apportionment methods "vary tremendously depending on the facts and circumstances of each case," Pakootas, 905 F.3d at 595.   Those questions must be determined in a subsequent hearing.

transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." Meghrig v. KFC W., Inc., 516 U.S. 479, 484 (1996); 42 U.S.C.A. § 6972(a)(1)(B).  Section 6972(a) authorizes district courts "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste ..., to order such person to take such other action as may be necessary, or both." 42 U.S.C.A. § 6972(a).  To prevail on a claim under RCRA § 7002(a)(1)(B), a plaintiff must prove that (1) defendant "was a past or present generator or transporter of solid or hazardous waste or past or present owner or operator of a solid or hazardous waste treatment, storage or disposal facility"; (2) defendant "contributed to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste"; and, (3) "the solid or hazardous waste in question may present an imminent and substantial endangerment to health or the environment." Cal. Dep't of Toxic Substances Control, 298 F. Supp. 2d at 971; 42 U.S.C. § 6972(a)(1).

Defendants contest only the substantial and imminent endangerment element.  As under plaintiffs' CERCLA claim, defendants also argue that the divisibility defense precludes summary judgment on this claim.  Assuming, without deciding, that the divisibility defense applies here just as it applies under a CERCLA claim, for the reasons above, the court rejects the divisibility argument and evaluates only whether the waste may present an imminent and substantial endangerment.

1.  Legal Standard

11

1        The RCRA authorizes injunctive relief where the site

2 conditions "may present an imminent and substantial endangerment

3 to health or the environment." Id. The language in the statute

4 is "expansive." Lincoln Properties, Ltd. v. Higgins, No. CIV. S-

5 91-760DFL/GGH, 1993 WL 217429, at *12 (E.D. Cal. Jan. 21, 1993)

6 (quoting Dague v. City of Burlington, 935 F.2d 1343, 1355 (2nd

7 Cir. 1991)).  First, the word "may" precedes the standard of

8 liability.  This wording is intended "to confer upon the courts

9 the authority to grant affirmative equitable relief to the extent

10 necessary to eliminate any risk posed by toxic wastes." Cal.

11 Dep't of Toxic Substances Control, 298 F. Supp. 2d at 971

12 (quoting id.).  Application of the statute is therefore not

13 limited to emergency situations.  Lincoln Properties, No. CIV. S-

14 91-760DFL/GGH, 1993 WL 217429, at *12.  Second, "endangerment"

15 means "a threatened or potential harm and does not require proof

16 of actual harm." Cal. Dep't of Toxic Substances Control, 298 F.

17 Supp. 2d at 971 (quoting id.)  Third, "a finding of 'imminence'

18 does not require a showing that actual harm will occur

19 immediately so long as the risk of threatened harm is present."

20 Id. (quoting Lincoln Properties, No. CIV. S-91-760DFL/GGH, 1993

21 WL 217429, at *13).

22        Finally, "'[s]ubstantial' does not require

23 quantification of the endangerment (e.g., proof that a certain

24 number of persons will be exposed, that 'excess deaths' will

25 occur, or that a water supply will be contaminated to a specific

26 degree) . . . endangerment is substantial if there is some

27 reasonable cause for concern that someone or something may be

28 exposed to a risk of harm by a release or a threatened release of

1    a hazardous substance if remedial action is not taken."  Id.

2    (quoting Lincoln Properties, 1993 WL 217429, at *13).

3    "Injunctive relief should not be granted," however, "'where the

4    risk of harm is remote in time, completely speculative in nature,

5    or de minimis in degree.'"  Id. (quoting Lincoln Properties, 1993

6    WL 217429, at *13).

7                    2.   Application

8         The court finds a genuine issue of material fact as to

9    whether the site conditions may present an imminent and

10   substantial endangerment.  Plaintiffs present evidence that the

11   levels of copper, nickel, and chromium at the Site exceed state

12   regulatory limits for both groundwater and soil.  (Decl. Anne Far

13   at 7-10).  Dr. Farr, plaintiffs' expert, relies on the findings

14   from three separate investigations conducted by Advanced

15   GeoEnvironmental on behalf of Capitol Plating, concluding that

16   the Site contained "hazardous levels of chromium, nickel, and

17   copper." (Id. at 7.)  Dr. Farr also cites two additional

18   investigations concluding the same. (Id. at 7-8.)  Defendants do

19   not offer competing evidence on the level of contamination found

20   on the Site nor do they dispute that the concentration of copper,

21   nickel, and chromium exceed regulatory limits.

22        The crux of the issue, however, is whether this level

23   of contamination constitutes an imminent and substantial

24   endangerment.  Dr. Farr concludes that such level of

25   "contamination poses a threat to human health and the

26   environment." (Decl. Anne Farr at 3 (Docket No. 95-27).)  On the

27   other hand, defendants argue that Dr. Farr relies on a Department

28   of Toxic Substance Control (DTSC) report that was written but

                              13

1  never issued.  (See id. at ¶ 25.)  Plaintiffs argue that the lack

2  of issuance does not mean that the Site is not an imminent and

3  substantial endangerment.  Id. at 5.  The DTSC's refusal to

4  conclude that the contamination may pose an imminent and

5  substantial danger, however, competes with Dr. Farr's conclusion

6  that the level of contamination does pose such a threat and

7  suffices to find an issue of material fact.

8       Indeed, this court cannot conclude that the risk of

9  harm is imminent and substantial merely because contamination

10  levels exceed California regulatory standards.  In Simsbury-Avon

11  Preservation Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199

12  (2d Cir. 2009), the Second Circuit refused to find an imminent

13  and substantial endangerment where lead levels "exceeded

14  Connecticut's [Remediation Standard Regulation] and [Significant

15  Environmental Hazard] thresholds for residential sites," and

16  plaintiff "dr[e]w the conclusion that lead contamination on the

17  site presents 'a potential exposure risk to both humans and

18  wildlife'" based "solely" on the contamination exceeding such

19  regulatory thresholds.  Id. at 212.  Plaintiff's report

20  specifically noted that "evaluation of the degree of such risk

21  would require a further risk assessment" and did not suggest

22  "that anyone is subject to long-term exposure to lead

23  contamination . . . or that there are realistic pathways of

24  exposure."  Id.

25       Simsbury-Avon is instructive here.  Every report Dr.

26  Farr relies on (other than the DTSC report) concludes only that

27  the contamination levels exceed California regulatory levels.

28  Just as in Simsbury-Avon, however, Dr. Farr repeatedly qualifies

14

1    the conclusions of almost every report by stating that the full

2    extent of contamination is unknown.  (Decl. Anne Farr at ¶ 19;

3    see also, e.g., id. at ¶ 21 ("The extent(s) of the constituents

4    exceeding [Maximum Concentration Levels] were not defined."); id.

5    at ¶ 23 ("Additional sampling . . . is necessary to fully

6    evaluate the extent of contamination at and emanating from the

7    Facility."); id. at 24 ("The full extent of the contamination has

8    not yet been defined.").)  Dr. Farr also does not conclude that

9    anyone is subject to long-term exposure, or that they

10   realistically will be exposed, to the contamination.  In other

11   words, Dr. Farr does not evaluate the risk at hand beyond the

12   conclusion that the levels of contamination exceed California

13   regulatory thresholds.  "State standards do not define a party's

14   federal liability under RCRA."  Interfaith Cmty. Org. v.

15   Honeywell Int'l, Inc., 399 F.3d 248, 261 n.6 (3d Cir. 2005).

16   This court therefore cannot conclude that the Site poses an

17   imminent and substantial threat based only on the Site's

18   noncompliance with California concentration limits.

19              3.   Injunctive Relief

20              "Section 6972(a) authorizes district courts 'to

21   restrain any person who has contributed or who is contributing to

22   the past or present handling, storage, treatment, transportation,

23   or disposal of any solid or hazardous waste ..., to order such

24   person to take such other action as may be necessary, or both.'"

25   Meghrig v. KFC W., Inc., 516 U.S. 479, 484 (1996).  Because

26   plaintiffs have not established all elements of the RCRA claim,

27   the current state of the record does not support issuance of a

28   mandatory injunction.  See id.; see also LAJIM, LLC v. Gen Elec.

                                15

1  <u>Co.</u>, 917 F.3d 933, 945 (7th Cir. 2019) ("A RCRA plaintiff either

2  demonstrates irreparable harm or fails to prove his or her case

3  on the merits."). Accordingly, plaintiffs' request for

4  injunctive relief is denied.

5          IT IS THEREFORE ORDERED that plaintiff's motion for

6  partial summary judgment on the issue of liability on their

7  federal claim for violation of the Comprehensive Environmental

8  Response, Compensation and Liability Act ("CERCLA") § 107(a) be,

9  and the same hereby is GRANTED.

10         IT IS FURTHER ORDERED that plaintiffs' motion for

11  summary judgment on their federal claim for violation of the

12  Resource Conservation Recovery Act ("RCRA") §7002(a) be, and the

13  same hereby is DENIED.

14         This matter is set for Status Conference on January 21,

15  2020, at 1:30 p.m., to discuss the scheduling of an evidentiary

16  hearing to determine the scope and extent of defendants'

17  liability and the proportionate share of the damages and cleanup

18  costs to be borne by each defendant on the CERCLA claim. At such

19  evidentiary hearing, the court will also hear the conflicting

20  evidence on the RCRA claim and consider the supplemental state

21  law claims. No later than ten court days before the Status

22  Conference, counsel shall file a Joint Status Report which shall

23  include suggested dates for the evidentiary hearing.

24  Dated:   December 3, 2019

25

26                          WILLIAM B. SHUBB
                            UNITED STATES DISTRICT JUDGE
27

28

                                16

# EXHIBIT B

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                           ----oo0oo----

11

12   CITY OF WEST SACRAMENTO,              No. 2:18-CV-00900 WBS EFB
     CALIFORNIA; and PEOPLE OF THE
13   STATE OF CALIFORNIA,

14              Plaintiffs,               MEMORANDUM AND ORDER RE:
                                          DEFENDANTS' DIVISIBILITY
15        v.                              DEFENSE

16   R AND L BUSINESS MANAGEMENT, a
     California corporation, f/k/a
17   STOCKTON PLATING, INC., d/b/a
     CAPITOL PLATING, INC., a/k/a
18   CAPITOL PLATING, a/k/a CAPITAL
     PLATING; CAPITOL PLATING, INC.,
19   a dissolved California
     corporation; ESTATE OF GUS
20   MADSACK, DECEASED; ESTATE OF
     CHARLES A. SCHOTZ a/k/a SHOTTS,
21   DECEASED; ESTATE OF E. BIRNEY
     LELAND, DECEASED; ESTATE OF
22   FRANK E. ROSEN, DECEASED; ESTATE
     OF UNDINE F. ROSEN, DECEASED;
23   ESTATE OF NICK E. SMITH,
     DECEASED; RICHARD LELAND, an
24   individual; SHARON LELAND, an
     individual; ESTATE OF LINDA
25   SCHNEIDER, DECEASED; JUDY GUESS,
     an individual; JEFFREY A. LYON,
26   an individual; GRACE E. LYON, an
     individual; THE URBAN FARMBOX
27   LLC, a suspended California
     limited liability company; and
28   DOES 1-50, inclusive,

                                  1

Defendants.

----oo0oo----

Plaintiffs City of West Sacramento, California and the People of the State of California (collectively, "plaintiffs") brought this action to address toxic levels of soil and groundwater resulting from the release of hazardous substances at a property once occupied by a metal plating facility. Plaintiffs' lawsuit involves the contamination at the property located at 319 3rd Street in West Sacramento, California (the "Site"). This court described much of the factual and procedural background to this lawsuit in its prior orders. (See Docket Nos. 18, 33, 44, 63, 115, & 125).

This court previously granted plaintiffs' motion for partial summary judgment and found defendants R and L Business Management ("R&L"), John Clark, and the Estate of Nick E. Smith (collectively, "defendants") liable under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). (Order at 10 (Docket No. 125).) The court then set an evidentiary hearing to determine whether defendants' contribution to the pollution at the Site is divisible from the total contamination present at the Site (the "divisibility hearing"). (Docket No. 129.) The divisibility hearing began on August 25, 2020 and lasted three days, concluding on August 27, 2020.

At the hearing, defendants offered the testimony of John Clark, the general manager who oversaw R&L's plating

2

1  operations at the Site, and Richard Leland, the owner of R&L.

2  Defendants also offered the expert testimony of Dr. Adam Love.

3  Plaintiffs offered the testimony of Andrew Reimanis, a hazardous

4  substances engineer at the California Department of Toxic

5  Substances Control ("DTSC"), and Daniel Gallagher, a senior

6  engineering geologist at DTSC.  Plaintiffs also offered the

7  expert testimony of Dr. Anne Farr.

8       Based on this testimony and additional evidence

9  submitted by the parties, the court finds that the defendants

10  have not met their burden to prove divisibility and are therefore

11  jointly and severally liable for the harm caused to the Site.

12  This memorandum constitutes the court's findings of fact and

13  conclusions of law pursuant to Federal Rule of Civil Procedure

14  52(a).[1]

15  I.   Factual Background

16       A.   Background on the Site's Characteristics and Operations

17       The Site at issue is a relatively small parcel--

18  approximately 80x160 feet, or 0.3 acres--located in a portion of

19  West Sacramento zoned "Mixed-Use Neighborhood Commercial."

20  (Expert Report Dr. Adam Love, Ex. 3, at 5 ("Love Report") (Docket

21  No. 180-1)[2]; Tr. of Evidentiary Hr'g 531:7-9 ("Hr'g Tr.") (Docket

22  No. 200-202).)  The Site is bordered by property containing a

23  firehouse to the north, Third Street to the east, and largely

24  vacant lots to the south and west.  (See Love Report at 5.)  The

25       [1] The court expresses no opinion as to whether or to what

26  extend defendants may offset their liability by the liability of
    another in a subsequent contribution proceeding under CERCLA

27  section 113.  See 42 U.S.C. § 9613(f).

       [2] All exhibit numbers refer to the parties' joint exhibit
28  list for the divisibility hearing.

1   Site and the surrounding properties were originally developed on

2   top of imported fill material.  (Love Report at 10.)

3          Beginning in the 1930s, the Site was used for

4   residential purposes and then as a bus and automobile repair

5   facility until 1949.  (Id.)  Between 1949 and 1973, a series of

6   businesses performed vehicle electroplating operations on the

7   Site.  (Id.)  Operations largely took place in a single facility

8   that abutted the northern and western property lines.[3]  (See Ex.

9   23).  The remainder of the Site consisted of a drainage area in

10  the southwest corner and a driveway where workers would park in

11  the southeast corner.  (See id.)

12         Defendant R&L purchased the business operating on the

13  Site, Capitol Plating, in 1973.  (Id.)  At the time, R&L was

14  incorporated as "Stockton Plating, Inc."[4]  (Hr'g Tr. 139:7-

15  141:1.)  Stockton Plating continued the same type of

16  electroplating operations on the Site as Capitol Plating, and

17  even retained the business' name, until 1985.  (Id.)  From 1985

18  to 1991, defendants used the Site to store bumpers.  (Id.)  No

19  operations have occurred on the Site since 1991.  (Id.)

20         B.   Overview of Contamination at the Site

21         Various environmental consulting groups have conducted

22  environmental investigations at the Site since 1986, including

23  defendants' expert, who collected soil and groundwater data at

24  the Site in 2020 for the purposes of preparing a remedial cost

25  estimate for the Site.  (See Love Report; Expert Report of Dr.

26  ─────────────

27  [3] This facility has since been demolished, but the concrete
    foundation is still present at the Site.  (See Ex. 7.)

28  [4] Defendant would later reincorporate as "R and L Business
    Management" in 1996.

                              4

1   Anne Farr, Ex. 1, at 7-16 ("Farr Report").)  Based on these

2   investigations, DTSC has determined that chromium, copper, lead,

3   nickel, and cadmium are present in Site soils at levels that

4   require remediation.  (Farr Report at 15.)  Samples from

5   monitoring wells and borings also show that groundwater at the

6   Site is contaminated with nickel, copper, chromium, and cadmium,

7   as well as a volatile organic compound ("VOC") known as 1,2-DCA.

8   (See, e.g., id. at 10.)

9         C.   Sources of Nickel, Copper, and Chromium Contamination

10            Electroplating operations at the Site have contributed

11   to the elevated levels and distribution of nickel, copper, and

12   chromium at the Site.  (See Farr Report at 16; Love Report at 12-

13   14.)  The process of electroplating objects like car bumpers is

14   likely to produce this type contamination because the process is

15   so reliant on liquid solutions containing metal.  (See Farr

16   Report at 16.)

17            Both defendants and previous electroplating businesses

18   at the Site primarily plated chrome bumpers.  (Id.)  The process

19   involved initially stripping away the bumper's plating down to

20   the bare metal using acid or alkaline solutions.  (Id.)  Any

21   damaged portions of the bumper were then ground, polished, and

22   straightened in two rooms located on the northeast corner of the

23   Site.  (Id.; Hr'g Tr. 110:23-112:1.)  Metal previously used to

24   plate the bumpers was released as particulates were ground off,

25   fell through the air, and settled on the ground.  (Hr'g Tr.

26   110:23-112:1).  Defendants and their predecessors gathered these

27   particulates with a dust collector or swept them up and

28   eventually placed them in a dumpster located in the southwestern

1   portion of the Site.  (Hr'g Tr. 77:14-78:11, 134:23-135:4; Ex.
2   23.)

3         Workers then placed the bumpers into tanks in the
4   facility's plating area that contained specific metal solutions--
5   first, copper; then, nickel; last, chromium--and applied an
6   electric current while they were submerged.  (Love Report at 6;
7   Ex. 23.)  A worker would manually lift each bumper by using two
8   hooked rods to leverage it in and out of the tank.  (Id.)
9   Workers also lowered the bumpers in and out of tanks containing
10  rinse water, and buffed the bumpers after each stage of the
11  plating operation and the finish coat.  (Id.)

12        Due to the height of the tanks, an elevated "duckboard"
13  floor was built in the plating area so the workers could stand in
14  the optimal position to lift and lower bumpers into the metal
15  solutions.  (Id. at 7.)  The duckboard consisted of two-by-fours
16  with half-inch spacers set in a grid pattern on the floor to
17  create an elevated platform approximately three feet high for the
18  workers to walk on around the tank.  (Id.)  Because of the space
19  between the two-by-fours, the duckboard permitted fluid falling
20  from above to fall directly onto the concrete floor below.  (Id.)
21  "Dragout" releases occurred when plating fluid or rinse water
22  would drip from the bumpers as they were pulled out of one tank
23  and moved into another.  (Rebuttal Expert Report of Dr. Farr, Ex.
24  5, at 7-11 ("Farr Rebuttal").)  These releases would not only
25  cause plating fluid or rinse water fluid to fall onto the
26  concrete, they would also cause the duckboard to get slippery and
27  wet.  (Id.)  Platers would sometimes slip, dropping the bumpers
28  and causing the contents of the tank to splash and fall onto the

6

1    ground.  (Id. at 9.)  Releases onto the concrete floor also

2    occurred when plating tanks leaked or holes developed due to

3    normal wear and tear, or when employees dropped the bumpers when

4    trying to move them from one tank to the next.  (Id. at 8-9.)

5            Any releases that reached the concrete floor in the

6    plating room would initially flow into a floor drain that

7    connected to a larger sewer system.  (Love Report at 7.)  When

8    the floor drain was unable to handle the volume of fluid

9    released, the plating fluids would flow out of the building

10   through a hole in the southern wall or through the back door

11   where they would spill out onto the ground outside.  (Id.)

12   Indeed, when Clark started as the general manager at the Capitol

13   Plating facility in 1973, he noticed that the ground outside the

14   hole in the wall was stained blue--evidence of releases of

15   liquids from the plating tanks and/or rinse tanks in the plating

16   room.  (Hr'g Tr. 49:15-50:12.)

17           Releases of metal plating wastes occurred in three

18   primary source areas.  (See Hr'g Tr. 251:7-253:7, 597:25-598:15;

19   Farr Report at 16.)  Plating operations released metals through

20   the footprint of the plating room and through the hole in the

21   southern wall of the plating process building into the parking

22   lot area. (Farr Report at 16.)  Releases also occurred in the

23   northeastern portion of the Site.  (Id.)

24       D.   Stockton Plating's Efforts to Prevent Releases

25           After Stockton Plating arrived at the Site in 1973, the

26   company made several operational and structural changes to try to

27   limit the number and magnitude of releases of plating metals to

28   the subsurface.  In 1973, Clark plugged the hole in the southern

1  wall of the plating facility with packed dirt to prevent releases

2  of plating fluid and rinse water from reaching the parking lot

3  area.  (Love Report at 7; Hr'g Tr. 56:15-57:5.)  Clark testified

4  that he recalled the earthen dam failing "five to ten" times

5  before he decided to replace it with a concrete retaining wall

6  that surrounded the wet plating operations the next year.  (Hr'g

7  Tr. 59:14-63:4; Farr Rebuttal at 6.)

8         Between 1973 and 1976, Stockton Plating also installed

9  a "counterflow" plumbing system and restrictor valves in the

10 rinse tanks, reduced overall water usage in the rinse tanks, and

11 installed racks above the plating tanks to reduce the number of

12 dragout and spillover releases from the tanks and pipe rinse

13 water directly into the sewer pump.  (Love Report at 14.)

14 II.  Legal Standard

15        Liability for potentially responsible parties under

16 CERCLA "is ordinarily joint and several, except in the rare cases

17 where the environmental harm to a site is shown to be divisible."

18 Pakootas v. Teck Cominco Metals, Ltd., 905 F.3d 565, 588 (9th

19 Cir. 2018) (emphasis added); see also Burlington N. & Santa Fe

20 Ry. Co. v. United States, 556 U.S. 599, 614 (2009).  The

21 divisibility defense allows CERCLA defendants to avoid joint and

22 several liability by showing "that a reasonable basis for

23 apportionment exists."  Burlington, 556 U.S. at 614.

24        "The divisibility analysis involves two steps."

25 Pakootas, 905 F.3d at 588.  First, the court determines whether

26 the contamination at issue is "theoretically capable of

27 apportionment."  Id.  "Second, if the harm is theoretically

28 capable of apportionment, the fact-finder determines whether the

8

1  record provides a 'reasonable basis' on which to apportion

2  liability, which is purely a question of fact."  Id.  If the

3  CERCLA defendant carries its burden, the court will apportion

4  liability among the responsible parties so that "each is subject

5  to liability only for the portion of the total harm that he has

6  himself caused."  See id. (quoting United States v. Chem-Dyne

7  Corp., 572 F. Supp. 802, 810 (S.D. Ohio 1983)) (alteration

8  omitted).  Otherwise, the responsible parties will be held

9  jointly and severally liable so that "each is subject to

10  liability for the entire harm."  Id. (quoting Chem-Dyne, 572 F.

11  Supp. at 810).

12        "[T]he defendant asserting the divisibility defense

13  bears the burden of proof" as to both elements of the defense.

14  Pakootas, 905 F.3d at 589; see also Burlington, 556 U.S. at 614.

15  "This burden is 'substantial' because the divisibility analysis

16  is 'intensely factual.'"  Pakootas, 905 F.3d at 598 (quoting

17  United States v. Alcan Aluminum Corp., 964 F.2d 252, 269 (3d Cir.

18  1992)).  "The necessary showing requires a 'fact-intensive, site-

19  specific' assessment," id. at 589 (quoting PCS Nitrogen Inc. v.

20  Ashley II of Charleston LLC, 714 F.3d 161, 182 (4th Cir. 2013)),

21  "generating 'concrete and specific' evidence," id., 905 F.3d at

22  589 (quoting United States v. Hercules, Inc., 247 F.3d 706, 718

23  (8th Cir. 2001)).  While absolute certainty is not required, "the

24  defendant must show by a preponderance of the evidence--including

25  all logical inferences, assumptions, and approximations--that

26  there is a reasonable basis on which to apportion the liability

27  for a divisible harm."  Id.

28        Apportionment under the divisibility defense is

9

1  "conceptually distinct from contribution or allocation of

2  damages."  Hercules, 247 F.3d at 718.  In a CERCLA §113(f)

3  contribution action, during "the allocation phase, the only

4  question is the extent to which a defendant's liability may be

5  offset by the liability of another; the inquiry at this stage is

6  an equitable one and courts generally take into account the so-

7  called 'Gore factors.'"  Id.; see also 42 U.S.C. § 9613(f)

8  (providing that a court "may allocate response costs among liable

9  parties using such equitable factors as the court determines are

10 appropriate") (emphasis added).  "The divisibility of harm

11 inquiry, by contrast, is guided not by equity--specifically, not

12 by the Gore factors--but by principles of causation alone."

13 Hercules, 247 F.3d at 718; see United States v. Rohm Haas Co., 2

14 F.3d 1265, 1280-81 (3d Cir. 1993); APL Co. Pte. Ltd. v. Kemira

15 Water Sols., Inc., 999 F. Supp. 2d 590, 624 (S.D.N.Y. 2014) ("The

16 divisibility doctrine is not a means by which courts allocate the

17 costs incurred in a cleanup and response operation among PRPs

18 [potentially responsible parties] on an equitable basis (i.e., on

19 the basis of relative fault).").  Instead, "equitable

20 considerations play no role in the apportionment analysis[.]"

21 PCS Nitrogen, 714 F.3d at 182 (quoting Burlington, 556 U.S. at

22 615 n.9).

23        Because courts must not consider equitable factors,

24 "where causation is unclear, divisibility is not an opportunity

25 for courts to 'split the difference' in an attempt to achieve

26 equity."  Hercules, 247 F.3d at 718.  "Rather, '[i]f they are in

27 doubt, district courts should not settle on a compromise amount

28 that they think best approximates the relative responsibility of

10

1  the parties.'  In such circumstances, courts lacking a reasonable

2  basis for dividing causation should avoid apportionment

3  altogether by imposing joint and several liability."  Id. at 718-

4  19 (citations omitted).

5  III.  Discussion

6        A.    Whether the Contamination Is Theoretically Capable of
             Apportionment

7

8             Whether the environmental harm is theoretically capable

9  of apportionment "is primarily a question of law."  Pakootas, 905

10  F.3d at 588.  "Underlying this question, however, are certain

11  embedded factual questions that must necessarily be answered,

12  such as 'what type of pollution is at issue, who contributed to

13  that pollution, how the pollutant presents itself in the

14  environment after discharge, and similar questions.'"  Id.

15  (quoting NCR Corp., 688 F.3d at 838).  This is because "a court

16  cannot say whether a harm 'is, by nature, too unified for

17  apportionment' without knowing certain details about the 'nature'

18  of the harm."  Pakootas, 905 F.3d at 591.  "As one commentator

19  has explained: 'Even if a party's waste stream can be separately

20  accounted for, its effect on the site and on other parties'

21  wastes at the site must also be taken into account.'"  Id.

22  (quoting William C. Tucker, All Is Number: Mathematics,

23  Divisibility and Apportionment Under Burlington Northern, 22

24  Fordham Envtl. L. Rev. 311, 316 (2011)).  "That is, 'a defendant

25  must take into account a number of factors relating not just to

26  the contribution of a particular defendant to the harm, but also

27  to the effect of that defendant's waste on the environment.'"

28  Id.  "Those factors generally include when the pollution was

11

discharged to a site, where the pollutants are found, how the pollutants are presented in the environment, and what are the substances' chemical and physical properties." Id. "Chief among the relevant properties are 'the relative toxicity, migratory potential, degree of migration, and synergistic capacities of the hazardous substances at the site.'" Id. (quoting United States v. Alcan Aluminum Corp., 990 F.2d 711, 722 (2d Cir. 1993)).

Moreover, "[f]or the purpose of apportioning CERCLA liability, the relevant 'harm' is the entirety of contamination at a site that has caused or foreseeably could cause a party to incur response costs, suffer natural resource damages, or sustain other types of damages cognizable under section 107(a)(4)." Id. at 592. The defendant asserting the divisibility defense must therefore produce evidence showing divisibility of the entirety of contamination at a site, the harm caused by its wastes combined with all other pollution, not just the harm caused by its wastes alone. Id. at 590-91.

Finally, the mixing of pollutants raises a rebuttable presumption of indivisible harm. Id. at 592-93. This presumption arises for pollutants that are physically interspersed, not just those that are chemically commingled. Id. at 593. "Even if pollutants do not chemically interact, their physical aggregation can cause disproportionate harm that is not linearly correlated with the amount of pollution attributable to each source." Id. In other words, "the fact that a single generator's waste would not in itself justify a response is irrelevant . . . as this would permit a generator to escape liability where the amount of harm it engendered to the

1    environment was minimal, though it was significant when added to

2    other generators' waste."  Id. (quoting Alcan, 964 F.2d at 264).

3           In this case, defendants' expert, Dr. Love, seeks to

4    determine defendants' contribution to the contamination at the

5    site by dividing the contaminants up three ways: geographically,

6    chemically, and volumetrically. (See Hr'g Tr. 250:13-251:6.)  He

7    then proposes a remedial plan that shows three distinct areas of

8    contamination, corresponding to the three primary source areas of

9    the releases at the Site.  (See Hr'g Tr. 250:13-253:7.)  Within

10   each of the three geographic areas, Dr. Love first looks to the

11   chemical nature of the contamination, concluding that because

12   defendants were not responsible for any lead releases at the

13   property, the plating metal contamination (i.e., nickel, copper,

14   and chromium) is divisible from the lead contamination.  (See id.

15   at 258:1-24.)

16          Dr. Love then estimates the portion of the plating

17   metal contamination that the defendants contributed, using time

18   spent at the Site as a proxy for volume and considering the

19   improvements to the plating equipment and operations that

20   Stockton Plating made after arriving on the Site. (See id. at

21   259:17-262:2.)  Based on these estimates, Dr. Love calculates

22   that defendants should only be liable for 3.1% of the costs laid

23   out in his plan to remedy the Site's soil and 3.7% of the costs

24   to remedy the Site's groundwater.  (See id. at 296:3-24; Love

25   Report at 22-23.)

26          A fundamental problem with Dr. Love's analysis is that

27   it fails to take into account the impact of the ongoing

28   investigation by the DTSC.  Before any remedial plan can be

                                  13

1    implemented it must be approved by the DTSC.  Michael Gallagher

2    is the DTSC hazardous substance engineer tasked with

3    investigating the Site and recommending a remedial plan.  He

4    testified at the hearing that the subsurface contamination at the

5    Site still has not been fully delineated.  (See id. at 466:14-23,

6    472:10-473:17.)  Based on his investigation of the Site to date,

7    Gallagher concludes that further sampling of soil and groundwater

8    beyond the property line to the southeast and the northeast is

9    needed to determine how far vertically and laterally chromium,

10   copper, nickel, and lead extend beyond the Site's property line.

11   (Id. at 489:23-490:3; Ex. 38 at 5.)

12          Gallagher also testified that it is impossible to know

13   whether Site groundwater contamination has been adequately

14   characterized, since reliable groundwater data has not been

15   collected since 2004 and the samples taken by Dr. Love were

16   biased.  (Hr'g Tr. 488:9-489:15, 490:16-25; Ex. 38 at 5.)

17   Because the full scope of the contaminant plume at the site is

18   still unknown, Gallagher has recommended to DTSC that it wait to

19   implement a remedial plan for the Site until additional

20   delineation of the contamination can be performed.  (Hr'g Tr.

21   473:5-17; Ex. 38 at 5.)  DTSC adopted Gallagher's recommendation

22   when it issued its imminent and substantial endangerment order.

23   (Hr'g Tr. 493:9-494:7.)

24          Thus, because Gallagher and (by extension, DTSC) is not

25   yet willing to approve a remedial plan for the Site, a percentage

26   cannot be accurate if the whole from which it is measured is not

27   known.  See Pakootas, 905 F.3d at 590-91 ("As a result, Teck was

28   required to produce evidence showing divisibility of the entire

1  harm caused by Teck's wastes combined with all other River

2  pollution--not just the harm from sources of Teck's six metals

3  alone." (emphasis added)).  Because the nature and extent of the

4  contamination at the Site have still not been fully defined, it

5  is entirely possible that further harm caused by Stockton Plating

6  beyond the property line or within it will be discovered.

7  Granting defendants' divisibility request based on Dr. Love's

8  analysis would leave the remaining defendants in the case holding

9  the bag for additional contamination or harm that was in fact

10  caused by Stockton Plating.

11          Considering all the evidence offered at the hearing,

12  the court is not convinced that Dr. Love's divisibility analysis

13  fully defines the contamination at the Site that will require

14  remediation.  Contamination that originated at the Site but has

15  since spread beyond the property line is part of the "relevant

16  harm" because it is foreseeable that it could cause a party to

17  incur response costs under CERCLA to remove it.  Pakootas, 905

18  F.3d at 591.  But testimony and reports by plaintiffs' expert,

19  Dr. Farr, as well as engineers at DTSC--the state regulatory

20  agency that will eventually have to review and approve a plan for

21  cleanup of the Site--indicate that the nature and extent of the

22  contamination at the Site, including how far the contamination

23  extends beyond the property line, has yet to be determined.  (See

24  Hr'g Tr. 549:11-551:21.)  Accordingly, Dr. Love's analysis fails

25  to satisfy defendants' burden of showing that the contamination

26  is theoretically capable of apportionment.

27          The trial court is given broad latitude in judging the

28  credibility of a witness and determining the weight to be given

1    to his testimony.  See Young Ah Chor v. Dulles, 270 F.2d 338, 341

2    (9th Cir. 1959).  Based upon the court's perception of the

3    witnesses at the evidentiary hearing and discrepancies between

4    Dr. Love's testimony and the evidence presented, the court finds

5    the testimony of Gallagher and Dr. Farr to be more credible than

6    that of Dr. Love.

7         Dr. Farr agrees that the full scope of the

8    contamination beyond the property lines to the southeast and

9    northeast remains undefined.  She testified that significant data

10   gaps remain for copper, chromium, and nickel soil concentrations

11   extending beyond the northeast and southeast property lines of

12   the Site, despite the amount of sampling that has taken place

13   over the years, including by Dr. Love.  (See Hr'g Tr. 473:5-17,

14   476:2-15; Ex. 2, fig.s 1, 5, 6.)  Similar data gaps exist with

15   respect to copper, nickel, and chromium concentrations in the

16   groundwater extending beyond the property line in all directions.

17   (See id., fig.s 7, 8, 9.)

18        Dr. Love also does not adequately account for the

19   uncertainty that remains surrounding the nature and extent of the

20   contamination at the Site.  He proposes a soil remedial scheme

21   that divides the Site into fourteen discrete "excavation areas,"

22   where the soil would be excavated and removed in volumes

23   determined according to the extent of metal contamination at that

24   location.  (See Hr'g Tr. 272:13-19; Love Report at 16-18; Ex. 4,

25   fig. 12.)  None of the excavation areas proposed for the

26   northeast corner of the Site extend beyond the property line,

27   despite the evidence showing that the contamination likely

28   spreads further out onto adjacent properties.  (Compare Ex. 4,

16

1   fig. 12 <u>with</u> Ex. 2, fig.s 1, 5, 6.)  And though the proposed

2   excavation area for the southeast corner of the Site does extend

3   onto the adjacent property, Dr. Love conceded on cross-

4   examination that additional investigation of the southeast corner

5   of the Site is still necessary to determine exactly how far

6   remediation there would need to extend.  (See Hr'g Tr. 332:19-

7   333:4.)  Absent an evaluation of the contamination as a whole,

8   the court cannot conclude that the harm is divisible.  <u>See</u>

9   <u>Pakootas</u>, 905 F. 3d at 594.

10           Moreover, Dr. Love fails to evaluate the contamination

11  beyond Stockton Plating's contribution to the pollution or the

12  additional impacts that mixing pollutants may have had, even in

13  the portions of the Site where the experts agree that the nature

14  and extent of the contamination is well-understood.  (<u>See</u> Hr'g

15  Tr. 473:5-17; 476:2-15.)  For instance, Dr. Love's groundwater

16  analysis does not adequately consider the impact of 1,2 DCA in

17  the groundwater.  He acknowledges the presence of 1,2 DCA at

18  unsafe levels, but his analysis does not provide enough

19  information to adequately assess current groundwater conditions

20  at the Site because it does not provide adequate field sampling

21  information for the data upon which the analysis relies or

22  indicate whether sampling wells were properly re-developed prior

23  to sample collection.  (Farr Report at 19-20; Ex. 38 at 5.)

24           Dr. Love also does not adequately evaluate the impact

25  of lead in the soil.  He concludes that the heightened lead

26  levels observed at the Site are due to fill material upon which

27  the Site was developed, not Stockton Plating's operations.  (Love

28  Report at 10-11; Farr Rebuttal at 3-4.)  Though plaintiff's

1  expert disputes this conclusion, (see Farr Rebuttal at 3-4), even

2  if the court assumes that Dr. Love is correct, his analysis

3  concedes that the lead is commingled and collocated with other

4  contaminants in the soil.  (See Love Report at 23; Hr'g Tr.

5  273:24-274:7.)  This type of commingling raises a rebuttable

6  presumption of indivisible harm.  Pakootas, 905 F. 3d at 594.

7  Yet Dr. Love makes no effort to rebut this presumption by showing

8  that lead does not chemically or physically interact with other

9  contaminants in the soil.  Id.; see also id. at 590-91 ("As a

10  result, Teck was required to produce evidence showing

11  divisibility of the entire harm caused by Teck's wastes combined

12  with all other River pollution--not just the harm from sources of

13  Teck's six metals alone.")

14          Dr. Love also dismisses the additional effects that

15  Stockton Plating's releases of plating metals may have had

16  through chemical or physical reactions with the plating metals or

17  other contaminants already present in the soil (often referred to

18  as "synergistic effects").  (See Farr Rebuttal at 12-13.)  He

19  acknowledges that the plating metals released by Stockton Plating

20  are commingled in the soil with plating metals released by prior

21  operators, but nevertheless concludes that the metals have not

22  produced any synergistic effects because they do not react

23  chemically with one another.  (See Hr'g Tr. 231:15-232:19.)  In

24  Pakootas, the court rejected a similar argument by the defendant:

25  "[e]ven if pollutants do not chemically interact, their physical

26  aggregation can cause disproportionate harm that is not linearly

27  correlated with the amount of pollution attributable to each

28  source."  Pakootas, 905 F.3d at 593.  Thus, even if Dr. Love is

1   correct in asserting that Stockton Plating's plating metals could

2   not have chemically interacted with metals released by prior

3   operators, his analysis is insufficient because it does not

4   address the potential exacerbating effects of physical

5   commingling between Stockton Plating's releases and plating

6   metals already present in the soil.   See id.

7        The court is persuaded by Dr. Farr's Rebuttal Report,

8   which points out that Dr. Love overlooked the potential for

9   releases from Stockton Plating's facility to drive metals already

10  in the soil deeper into the subsurface and into groundwater as

11  concentrations near the surface reached equilibrium.  (See Farr

12  Rebuttal at 12-13.)  The court therefore cannot conclude that the

13  impact of Stockton Plating's releases of additional copper,

14  nickel, and chromium into the soil or groundwater was linear.

15  See Pakootas, 905 F.3d at 593.

16       For these reasons, defendants have not established that

17  the entirety of the contamination is theoretically capable of

18  apportionment.

19       B.   Whether a Reasonable Basis for Apportionment Exists

20       Even if the contamination were theoretically capable of

21  apportionment, the defendants' claim of divisibility would still

22  fail because they have not put forward a reasonable basis for

23  apportionment.  In the second step of the divisibility analysis,

24  a CERCLA defendant must show that "there is a reasonable basis

25  for determining the contribution of each cause to a single harm."

26  Burlington, 556 U.S. at 614 (quoting Restatement (Second) of

27  Torts § 433A(1)(b)); Pakootas, 905 F.3d at 595.  "What is

28  reasonable in one case may not be in another, so apportionment

19

1   methods 'vary tremendously depending on the facts and

2   circumstances of each case.'"  Pakootas, 905 F.3d at 595 (quoting

3   Hercules, 247 F.3d at 717).  The basis for apportionment may rely

4   on the "simplest of considerations," most commonly volumetric,

5   chronological, or geographic factors.  Burlington, 556 U.S. at

6   617–18; Pakootas, 905 F.3d at 595.  "The only requirement is that

7   the record must support a 'reasonable assumption that the

8   respective harm done is proportionate to' the factor chosen to

9   approximate a party's responsibility."  Pakootas, 905 F.3d at 595

10  (quoting Restatement (Second) of Torts § 433A cmt. d).

11         Here, defendants argue that amount of contamination

12  attributable to defendants can be apportioned chemically,

13  geographically, and volumetrically.  For the following reasons,

14  none of these options provides a reasonable basis for

15  apportionment.

16              1.   Chemical Apportionment

17         Dr. Love concludes that soil contaminants at the Site

18  are readily distinguishable as metals originating from plating

19  operations (copper, nickel, and chromium) and metals originating

20  from fill material (lead).  (See Love Report at 20.)   In other

21  words, because Dr. Love concludes that all lead at the Site

22  originated from fill material, he apportions no responsibility or

23  cost for remediation to defendants for soil that contains only

24  lead, and apportions 50% responsibility for portions of soil that

25  contain lead and another metal originating from plating

26  operations.  (See id. at 23.)

27         Dr. Love's assumption that all lead at the Site must

28  originate with fill material is not based on site-specific data.

1    Rather it is based only on shallow soil samples collected at the

2    Firehouse Property north of the Site.  (Farr Rebuttal at 3.)  Dr.

3    Love provides no analysis to determine whether the elevated lead

4    concentrations in these shallow soil samples were also detected

5    in fill soils.  (Id.)  And, crucially, his analysis fails to

6    account for sampling in 2008 that failed to detect lead at

7    elevated concentrations in fill soils at the Site and to the east

8    of the Site.  (Id. at 4.)  If anything, the evidence tends to

9    show that one of the primary source areas for lead was the

10   parking lot located in the southeastern corner of the Site.

11   (Id.)  The elevated lead concentrations in this portion of the

12   Site are commingled and collocated with elevated chromium,

13   copper, and nickel, suggesting that Stockton Plating could have

14   been the source of at least some of the lead contaminants found

15   in the soil.  (See id.)  It is therefore not reasonable to assume

16   that defendant contributed 0% of the harm to soil contaminated

17   only with lead or even 50% of the harm to soil contaminated with

18   lead and one other metal.  See Burlington, 556 U.S. at 617–18;

19   Pakootas, 905 F.3d at 595.

20              2.  Geographic Apportionment

21        Dr. Love's analysis uses geographic location to try to

22   apportion fault by identifying three distinct areas of the Site

23   where plating metal contamination can be found: the plating

24   facility footprint, the southern rinse water drainage area, and

25   the northeast dumping area.  (See Love Report at 19.)  According

26   to the analysis, defendants cannot be held responsible for any of

27   the contamination in the northeast dumping area because all the

28   contaminants found there originate from fill material or dumping

                                   21

1   of plating metals that occurred prior to Stockton Plating's

2   operations at the Site.  (See id. at 20.)

3          This attempt to apportion fault geographically ignores

4   evidence that Stockton Plating likely contributed to

5   contamination in the northeast corner of the Site.  Stockton

6   Plating's operations in the northeast corner of the Site included

7   grinding, straightening, and polishing chrome-plated bumpers.

8   (Hr'g Tr. 110:23-112:19; 115:22-116:17.)  This process resulted

9   in releases of copper, nickel, and chromium that fell through the

10  air and settled onto the ground.  (Id.)  Though these operations

11  took place indoors and above a concrete floor, two fires in 1973

12  and 1985 could have resulted in the release of particles outside

13  the building either directly or via firefighters' efforts to

14  douse the flames.  (Id. at 161:18-162:22.)  A major rain event in

15  the Sacramento area in 1986, after defendant had ceased

16  operations but before it had completely removed its chemicals and

17  equipment from the property, could have also spread metal

18  particles to the subsurface.  (See Ex. 52.)  In light of the

19  evidence of additional ways that releases of plating metals from

20  the northeast corner of the facility could have made their way to

21  the subsurface, the court cannot find that the record reasonably

22  supports an assumption that defendants are not responsible for

23  any of the harm to the northeastern portion of the Site.  See

24  Pakootas, 905 F.3d at 595.

25         In addition, Dr. Love gives the impression that the

26  geographic areas he defines would remain distinct throughout the

27  process of remediation.  (See Ex. 4, fig. 12.)  But as Dr. Love

28  conceded on cross-examination, the excavation areas his analysis

proposes would not remain separate and distinct once excavation

began. (See Hr'g Tr. 342:1-343:20.) The court is persuaded by

Dr. Farr's testimony and rebuttal report, which point out that

repeated releases over a period of years at a site this small are

likely to form "one big blob" in the soil. (See Hr'g Tr. 531:23-

532:7, 625:3-626:24; Farr Rebuttal at 15.) It is simply not

possible in this case to carve up the Site geographically into

separate and distinct portions that reflect the defendants'

"contribution . . . to a single harm." Burlington, 556 U.S. at

614 (quoting Restatement (Second) of Torts § 433A(1)(b)). There

is therefore no reasonable basis upon which to apportion the harm

geographically.

### 3. Volumetric Apportionment

Finally, Dr. Love attempts to apportion defendants'

contribution to the harm at the Site within the geographically

and chemically divisible areas in his analysis using a volumetric

approach. (See Love Report at 20-22.) Essentially, Dr. Love

calculates the relative amount of plating metals within the three

defined portions of the Site that Stockton Plating's operations

were responsible for, as compared to prior operators at the Site.

(See id.)

To distinguish between releases attributable to

defendant and releases attributable to prior operators at the

Site, Dr. Love argues that the measures taken by Stockton Plating

shortly after it took over operations at the Site eliminated the

possibility of releases occurring through the hole of the

southern wall of the plating facility after 1974 or through the

footprint of the plating room after 1975. (See Love Report at

14.)  He also concludes that any releases that occurred as
Stockton Plating was implementing these operational changes were
"minimal and incremental" compared to prior plating operations at
the Site.  (See id. at 14-15.)  Because neither defendants nor
prior operators kept adequate records to determine the specific
volume of plating fluids used at the Site, Dr. Love's analysis
uses time on the Site as a proxy for volume.  (Love Report at
20.)  Resting on the assumption that "the production volume of
the plating operations was fairly similar throughout the history
of Site operations," the analysis calculates that defendants only
contributed 3.1% of the harm to Site soil and 3.7% of the harm to
Site groundwater.  (Love Report at 20, 22-23.)

          The court cannot accept Dr. Love's attempt to apportion
fault volumetrically because his analysis relies on fundamentally
flawed assumptions and reaches conclusions that are belied by
evidence concerning Stockton Plating's operations and the nature
of the contamination at the Site.  See Burlington, 556 U.S. at
617-18; Pakootas, 905 F.3d at 595.  Dr. Love opines that any
discharges by the defendant prior to 1974 were minimal or
incremental, but his analysis does not mention the "five to ten"
known releases of plating metals that Stockton Plating's general
manager admitted occurred before he replaced the earthen dam with
the concrete retaining wall.  (Hr'g Tr. 57:16-25.)  Dr. Love also
provides no analysis or estimate of the volume of waste or
contaminant mass released through the hole in the southern wall
of the plating facility as a result of these known discharges.
(Farr Rebuttal at 6.)

          Dr. Love also assumes that the concrete retaining wall

24

1  prevented any liquid from migrating out of the plating area.

2  (Love Report at 14.)  While the wall likely reduced the amount of

3  releases that made their way outside the plating area, the court

4  is not convinced that it eliminated the risk entirely.  (See Farr

5  Rebuttal at 6.)  Dr. Farr's testimony confirms that the wall was

6  not designed to be impermeable to liquids.  (Hr'g Tr. 534:14-

7  535:4.)  Site inspections revealed cracks and erosion of the

8  concrete retaining wall as well as mineral discoloration,

9  indicating that liquids did in fact migrate through the concrete

10 wall during Stockton Plating's operations after 1974.  (Farr

11 Rebuttal at 7.)  Because the opening to the sewer was located

12 within the bounds of the retaining wall, any fluid that made it

13 beyond the retaining wall would likely have been released onto

14 the land south of the plating facility.  (Id.)

15      Dr. Love also assumes that Stockton Plating's

16 installation of racks above the plating tanks and improvements to

17 the rinse tanks' pipes eliminated the potential for releases to

18 occur from the plating room after 1975.  (Love Report at 14.)

19 This is contrary to testimony by Clark that the floor of the

20 plating room would still get wet as a result of plating

21 operations even after Stockton Plating installed the counterflow

22 and drainpipe systems.[5]  (Hr'g Tr. 119:22-120:4.)

23

24      [5] Dr. Farr's rebuttal report also relied on deposition
    testimony by Stockton Plating's own officers and owners
25  indicating that plating operations continued to cause discharges
    of plating liquids and rinse water onto the concrete floor after
26  Stockton Plating's improvements were put into place.  (Farr
    Rebuttal at 7-11.)  Deposition testimony by Leland specifically
27  showed that dragout releases continued to occur all the way up
    until plating operations at the Site ceased in 1985.  (Id.)
28

1          Even if Stockton Plating's improvements to its plating

2   equipment reduced the frequency with which releases occurred, it

3   strains credulity to believe that they eliminated the risk

4   completely.  (Id. at 9-10.)  And, contrary to Dr. Love's

5   assumption, a release onto the concrete floor or directly into

6   the sewer system would not necessarily prevent the plating metal

7   from reaching the subsurface.  Neither the concrete slab nor the

8   sewer system was completely impermeable to liquids; releases

9   therefore could have made their way through the concrete slab--

10   especially if there were joints or fractures in the floor--or

11   through joints and cracks in the sewer lines.  (Id. at 11-12;

12   Hr'g Tr. 534:14-535:4.)

13          Finally, Dr. Love's entire volumetric analysis rests on

14   the assumption that the production volume of plating operations

15   at the Site remained relatively constant from 1949 to 1975.  But

16   Clark and Leland's testimony tends to establish that business

17   increased during Stockton Plating's time at the Site.  (Hr'g Tr.

18   73:15-25, 99:19-101:21.)  Stockton Plating added a second 1,250-

19   gallon copper tank to the premises that allowed workers to plate

20   two bumpers simultaneously, and implemented efficiency

21   improvements that allowed the Site to process more bumpers each

22   shift.  (Id.)  Dr. Farr agreed that changes in the facility's

23   footprint indicated that production at the facility was likely

24   increasing over time.  (Hr'g Tr. 539:24-540:17, 561:8-19; Farr

25   Rebuttal at 14-18.)  While some evidence indicates that Stockton

26   Plating pursued increased "finished bumpers" business in the late

27   1970s that would have had little to no potential for releases of

28   plating metals, the weight of the evidence--much of it provided

26

by defendants' own managers and owners--indicates that operations
that carried a risk of releases increased over time at the Site.
Dr. Love's assumption that production stayed relatively constant
was therefore unreasonable.  See Pakootas, 905 F.3d at 595
(quoting Hercules, 247 F.3d at 717).

        In summary, to accept Dr. Love's theory of volumetric
apportionment, the court would have to (1) accept that the memory
of Stockton Plating's general manager of events that occurred
almost 50 years ago is accurate and that there were only five to
ten releases of plating fluids at the Site in 1973, (2) assume
that these releases were de minimis, and (3) assume that the
structural and operational improvements defendants implemented
over the next two years prevented any releases of plating fluids
from reaching the subsurface, all while assuming, contrary to the
evidence, that operations at the Site remained relatively
constant over time.

        Defendants essentially ask the court to stack
assumption on top of assumption to conclude that they should be
held liable for exactly 3.1% of the harm to Site soil and exactly
3.7% of the harm to Site groundwater.  (See Love Report at 20,
22-23.)  Because these assumptions run counter to the weight of
the evidence, defendants have not met the "substantial" burden of
showing a reasonable basis for determining their contribution to
the overall harm at the Site.  Pakootas, 905 F.3d at 598 (quoting
Alcan, 964 F.2d at 269).

        IT IS THEREFORE ORDERED that the defendants' request
for a finding of divisibility be, and the same hereby is, DENIED.
The court hereby finds and declares as follows:

27

1.  Defendants have not met their burden of establishing that the contamination at the Site is theoretically capable of apportionment.

2.  Even if the contamination were theoretically capable of apportionment, defendants have not met their burden of establishing that there is a reasonable basis by which to determine their contribution to the overall harm.

3.  The CERCLA liability of Defendants R&L, John Clark, and the Estate of Nick E. Smith is not divisible from the total contamination present at the Site.

4.  Defendants R&L, John Clark, and the Estate of Nick E. Smith are therefore jointly and severally liable for the CERCLA violations that have occurred at the Site.

5.  The court expresses no opinion as to whether or to what extent defendants may offset their liability by the liability of another in a subsequent contribution proceeding under CERCLA section 113.

Dated:  September 16, 2020

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

28

# EXHIBIT C

1

2

3

4

5

6

7

8

9               UNITED STATES DISTRICT COURT

10              EASTERN DISTRICT OF CALIFORNIA

11                   ----oo0oo----

12

13   CITY OF WEST SACRAMENTO,           No. 2:18-cv-00900 WBS EFB
     CALIFORNIA; and PEOPLE OF THE
14   STATE OF CALIFORNIA,

15          Plaintiffs,                 MEMORANDUM AND ORDER RE:
                                        PLAINTIFFS' MOTION FOR
16      v.                              PARTIAL SUMMARY JUDGMENT ON
                                        ITS PUBLIC NUISANCE AND
17   R AND L BUSINESS MANAGEMENT, a     PORTER-COLOGNE ACT CLAIMS
     California corporation, f/k/a
18   STOCKTON PLATING, INC., d/b/a
     CAPITOL PLATING INC., a/k/a
19   CAPITOL PLATING, a/k/a CAPITAL
     PLATING; CAPITOL PLATING, INC.,
20   a dissolved California
     corporation; et al.,
21
            Defendants.
22

23                   ----oo0oo----

24          Plaintiffs City of West Sacramento, California and the

25   People of the State of California (collectively, "plaintiffs")

26   brought this action to address toxic levels of soil and

27   groundwater contamination resulting from the release of hazardous

28
                              1

1   substances from a metal plating facility formerly located at 319

2   3rd Street, West Sacramento, California (the "Site").

3          The court previously granted in part plaintiffs' motion

4   for partial summary judgment, holding defendants R and L Business

5   Management ("R&L"), John Clark, and the Estate of Nick E. Smith

6   (collectively, "defendants") liable under the Comprehensive

7   Environmental Response, Compensation, and Liability Act

8   ("CERCLA"), 42 U.S.C. § 9607(a).  (Order at 10 (Docket No. 125).)

9   The court found that triable issues of material fact remained as

10  to plaintiffs' claim under the Resource Conservation and Recovery

11  Act ("RCRA"), 43 U.S.C. § 6972.  (Id. at 14-16.)

12         After holding an evidentiary hearing, the court further

13  determined that defendants' contribution to the pollution at the

14  Site was not divisible from the total contamination present at

15  the Site under CERCLA.  (See Mem. and Order re: Defendants'

16  Divisibility Defense ("Divisibility Order") (Docket No. 203).)

17  The court described the factual and procedural background of this

18  lawsuit in great detail in these prior orders.  (See Docket Nos.

19  125, 203.)

20         Plaintiffs now move for partial summary judgment

21  against defendants as to their claims under California public

22  nuisance law and the Porter-Cologne Water Quality Control Act,

23  Cal. Wat. Code § 13304(c).[1]

24  I.    Legal Standard

25         [1]   Plaintiffs' contemporaneous motion for summary judgment
26  on their claims under the Gatto Act, Cal. Health & Safety Code §§
    25403.1, 25403.5; the Carpenter-Presley-Tanner Hazardous
27  Substance Account Act ("HSAA"), Cal Health & Safety Code §
    25363(d); and for Injunctive Relief will be decided in a separate
28  Order.

1          A.    Summary Judgment

2          Summary judgment is proper "if the movant shows that

3    there is no genuine dispute as to any material fact and the

4    movant is entitled to judgment as a matter of law."  Fed. R. Civ.

5    P. 56(a).  A material fact is one that could affect the outcome

6    of the suit, and a genuine issue is one that could permit a

7    reasonable jury to enter a verdict in the non-moving party's

8    favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

9    (1986).

10         The party moving for summary judgment bears the initial

11   burden of establishing the absence of a genuine issue of material

12   fact and can satisfy this burden by presenting evidence that

13   negates an essential element of the non-moving party's case.

14   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

15   Alternatively, the movant can demonstrate that the non-moving

16   party cannot provide evidence to support an essential element

17   upon which it will bear the burden of proof at trial.  Id.  Any

18   inferences drawn from the underlying facts must, however, be

19   viewed in the light most favorable to the party opposing the

20   motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

21   U.S. 574, 587 (1986).

22   II.  Discussion

23         Plaintiffs first argue that they are entitled to

24   summary judgment on their claim that defendants' contributions to

25   pollution at the Site have caused a public nuisance.  (See Pls.'

26   Mem. P. & A. at 23-32 (Docket No. 204).)  Under California law, a

27   nuisance is "[a]nything which is injurious to health . . . or is

28   indecent or offensive to the senses, or an obstruction to the

                                    3

1    free use of property, so as to interfere with the comfortable

2    enjoyment of life or property . . . ."  Cal. Civ. Code § 3479.  A

3    public nuisance is "one which affects at the same time an entire

4    community or neighborhood, or any considerable number of persons,

5    although the extent of the annoyance or damage inflicted upon

6    individuals may be unequal."  Cal. Civ. Code § 3480.  A plaintiff

7    must show "substantial and unreasonable interference, either with

8    a public right or with the enjoyment of a plaintiff's property."

9    Coppola v. Smith, 935 F. Supp. 2d 993, 1017–19 (E.D. Cal. 2013)

10   (Ishii, J.) (citing City of Los Angeles v. San Pedro Boat Works,

11   635 F.3d 440, 452 (9th Cir. 2011); People ex rel. Gallo v. Acuna,

12   14 Cal. 4th 1090 (Cal. 1997)).

13         To prevail on a claim of public nuisance, "[a]

14   plaintiff must establish a 'connecting element' or a 'causative

15   link' between the defendant's conduct and the threatened harm."

16   Citizens for Odor Nuisance Abatement v. City of San Diego, 8 Cal.

17   App. 5th 350, 359 (2017) (quoting In re Firearm Cases, 126 Cal.

18   App. 4th 959, 988 (2005)).  "[T]he causation element of a public

19   nuisance cause of action is satisfied if the conduct of a

20   defendant is a substantial factor in bringing about the result."

21   People v. ConAgra Grocery Products Co., 17 Cal. App. 5th 51, 101

22   (2017).

23         "'The substantial factor standard is a relatively broad

24   one, requiring only that the contribution of the individual cause

25   be more than negligible or theoretical.'  Thus, 'a force which

26   plays only an infinitesimal or theoretical part in bringing about

27   injury, damage, or loss is not a substantial factor,' but a very

28   minor force that does cause harm is a substantial factor."  Id.

                                  4

1    (quoting Bockrath v. Aldrich Chem. Co., 21 Cal. 4th 71, 79 (Cal.

2    1999)).

3          Plaintiffs also argue that they are entitled to summary

4    judgment on their claim that defendants violated the Porter

5    Cologne Water Quality Control Act. The Porter-Cologne Act permits

6    a governmental cost recovery claim to be brought against "any

7    person who has discharged or discharges waste . . . or who has

8    caused or permitted . . . waste to be discharged or deposited . .

9    . into the waters of the state and creates, or threatens to

10   create, a condition of pollution or nuisance."  Cal. Wat. Code §

11   13304(a).

12         To prevail on a claim under the Porter-Cologne Act, a

13   plaintiff must satisfy the same common-law causation requirements

14   as for a claim under California public nuisance law.  See City of

15   Modesto Redev. Agency v. Superior Court, 119 Cal. App. 4th 28, 38

16   (2004) ("[I]t appears that the Legislature not only did not

17   intend to depart from the law of nuisance, but also explicitly

18   relied on it in the Porter-Cologne Act . . . .").

19         Here, a disputed issue of fact remains as to whether

20   defendants' acts or omissions were a substantial factor in

21   causing the nuisance or condition of pollution at issue.

22   Defendants' expert, Dr. Love, and plaintiffs' expert, Dr. Farr,

23   disagree as to the extent of defendants' contribution to the

24   pollution at the Site.  While Dr. Farr concludes that defendants'

25   contribution was significant enough to require remediation on its

26   own, independent of any contributions made by prior operators of

27   the Site (see Salazar Decl. Ex. C, Rebuttal Exp. Report of Dr.

28   Farr at 5-13 ("Farr Rebuttal") (Docket No. 206-1)), Dr. Love

5

1   concludes that defendants' contributions "would have been trivial

2   compared to the numerous years of hazardous materials release

3   from previous Site operations" and "would reasonably be expected

4   to not have, on their own, caused the need for site clean-up"

5   (see Salazar Decl. Ex. B, Exp. Report of Dr. Love at 15 ("Love

6   Report") (Docket no. 206-1)).   Though the court previously

7   assessed the experts' credibility the evidentiary hearing on

8   defendants' divisibility defense under CERCLA, the court made no

9   finding of credibility in the context of issue of causation now

10  before the court.  (See generally Divisibility Order.)

11          Plaintiff's motion for summary judgment on its nuisance

12  and Porter Cologne Act claims must therefore be denied.  See

13  Celotex, 477 U.S. at 322–23.  The court will resolve the

14  credibility of Dr. Love and Dr. Farr as to causation with respect

15  to plaintiffs' claims for nuisance Porter Cologne Water Quality

16  Control Act violation at the time of trial.

17          IT IS THEREFORE ORDERED that plaintiffs' motion for

18  summary judgment (Docket No. 204) be, and the same hereby is,

19  DENIED as to plaintiffs' claims under California public nuisance

20  law and the Porter Cologne Water Quality Control Act.

21  Dated:  October 28, 2020

22                          WILLIAM B. SHUBB
                            UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

                                6

# **<u>EXHIBIT D</u>**

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                           ----oo0oo----

11

12   CITY OF WEST SACRAMENTO,              No. 2:18-cv-00900 WBS EFB
     CALIFORNIA; and PEOPLE OF THE
13   STATE OF CALIFORNIA,

14              Plaintiffs,               AMENDED MEMORANDUM AND ORDER
                                          RE: PLAINTIFFS' MOTION FOR
15        v.                              SUMMARY JUDGMENT ON THEIR
                                          CLAIMS UNDER THE GATTO ACT
16   R AND L BUSINESS MANAGEMENT, a       AND THE HSAA
     California corporation, f/k/a
17   STOCKTON PLATING, INC., d/b/a
     CAPITOL PLATING INC., a/k/a
18   CAPITOL PLATING, a/k/a CAPITAL
     PLATING; CAPITOL PLATING, INC.,
19   a dissolved California
     corporation; et al.,
20
                Defendants.
21

22                           ----oo0oo----

23          Plaintiffs City of West Sacramento, California and the

24   People of the State of California (collectively, "plaintiffs")

25   brought this action to address toxic levels of soil and

26   groundwater contamination resulting from the release of hazardous

27   substances from a metal plating facility formerly located at 319

28
                                 1

1  3rd Street, West Sacramento, California (the "Site").

2          The court has previously granted summary judgment for

3  plaintiffs on the issue of liability on their claim under the

4  Comprehensive Environmental Response, Compensation, and Liability

5  Act ("CERCLA"), 42 U.S.C. § 9607(a), against defendants R and L

6  Business Management ("R&L"), John Clark, and the Estate of Nick

7  E. Smith (collectively, "defendants").  (Order at 10 (Docket No.

8  125).)  The court has also found that triable issues of material

9  fact remain as to plaintiffs' claims under the Resource

10  Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 7002(a),

11  California public nuisance law, and the Porter-Cologne Water

12  Quality Control Act, Cal. Water Code § 13304(c). (See id. at 14-

13  16; Docket No. 211.)  Additionally, after an evidentiary hearing

14  the court has determined that defendants' contribution to the

15  pollution at the Site is not divisible from the total

16  contamination present at the Site under CERCLA.  (See Mem. and

17  Order re: Defendants' Divisibility Defense ("Divisibility Order")

18  (Docket No. 203).)  The facts and procedural background of the

19  case have been discussed fully in these prior Orders, and will

20  not be repeated here.  (See Docket Nos. 125, 203, 211.)

21          The remaining motion before the court is plaintiffs'

22  motion for partial summary judgment on their Carpenter-Presley-

23  Tanner Hazardous Substance Account Act ("HSAA") claim, Cal.

24  Health & Safety Code §§ 25363(d), and on their claim under the

25  Gatto Act, Cal. Health & Safety Code §§ 25403.1, 25403.5 and.

26  (See Pls.' Mot. Partial Summ. J. ("Pls.' Mot.") (Docket No.

27  204).)  On their Gatto Act claim, the City requests a permanent

28  injunction requiring defendants to investigate and clean up

2

1    releases of hazardous materials at the Site.   (See id. at 32-35.)

2    II.   Discussion

3         A.   HSAA

4         The HSAA allows any "person who has incurred response

5    or corrective action costs in accordance with [CERCLA to] seek

6    contribution or indemnity from any person who is liable pursuant

7    to [the HSAA]."   Cal. Health and Safety Code § 25363(d).   For the

8    purposes of the HSAA, a "'responsible party' or 'liable person,'

9    . . . means those persons described in section 107(a) of

10   [CERCLA]."   Id. § 25323(a)(1).   Thus, a cost recovery claim under

11   the HSAA has the same elements as a cost recovery claim under

12   CERCLA.   Orange Cty. Water Dist. v. Alcoa Glob. Fasteners, Inc.,

13   12 Cal. App. 5th 252, 297 (2017); Castaic Lake Water Agency v.

14   Whittaker Corp., 272 F. Supp. 2d 1053, 1084 n.40 (C.D. Cal. 2003)

15   ("HSAA creates a scheme that is identical to CERCLA with respect

16   to who is liable.").

17        Because the court has already found defendants to be

18   liable under CERCLA § 107 (see Docket No. 125), defendants do not

19   dispute that plaintiffs have satisfied the elements of liability

20   on their claim under the HSAA.   (See Defs.' Opp'n at 2.)

21   Accordingly, plaintiffs' motion summary judgment on the issue of

22   liability under the HSAA will be granted.   Damages have yet to be

23   determined, and plaintiffs do not seek summary judgment on the

24   amount of damages at this time.

25        B.   The Gatto Act

26        The Gatto Act authorizes California "local agencies,"

27   including cities and counties, to investigate and clean up

28   properties within their jurisdiction that have been contaminated

3

by hazardous materials and to recover the costs of investigation

and cleanup from responsible parties.  See Cal. Health & Safety

Code §§ 25403.1, 25403.5.  Section 25403.1 provides local

agencies with investigatory and cleanup authority, subject to

certain procedural requirements:

> A local agency may, in accordance with this
> chapter, take any action that the local
> agency determines is necessary and that is
> consistent with other state and federal laws
> to investigate and clean up a release on,
> under, or from blighted property that the
> local agency has found to be within a
> blighted area within the local agency's
> boundaries due to the presence of hazardous
> materials following a Phase I or Phase II
> environmental assessment . . . .

Cal. Health & Safety Code § 25403.1(a)(1)(A).

This section applies "whether the local agency owns

that property or not."  Id.  In other words, without the need for

a court order a local agency may enter blighted property that it

does not own to investigate and clean up the property so long as

(1) the agency provides the owner of the property with 60 days'

notice to respond and to propose an investigation and/or cleanup

plan, and (2) the owner fails to respond or provides an

inadequate response.  See id. §§ 25403.1(a)(1)(A),

25403.1(b)(2)(A).

Section 25403.5 further allows local agencies to

recover the costs they incur during the investigation and cleanup

of a site.  See id. § 25403.5.  "[I]f a local agency undertakes

action to investigate property or clean up, or to require others

to investigate or clean up, including compelling a responsible

party through a civil injunctive action, a release of hazardous

4

1  material, the responsible party shall be liable to the local

2  agency for the costs incurred in the action." Id.  Like the

3  HSAA, a "responsible party" for the purposes of the Gatto Act is

4  anyone who qualifies as a responsible party under CERCLA

5  § 107(a).  See id. §§ 25403.5(a), 25403(s), 25323.5(a)(1).

6       Defendants again concede that they are responsible

7  parties under the Gatto Act § 25403.5 because the court has

8  already found them to be liable under CERCLA §107(a).  (See

9  Defs.' Opp'n at 2; Docket No. 125.)  Defendants also do not

10  dispute that the City has fulfilled the remaining Gatto Act

11  requirements set out in section 25403.1--namely, (1) that

12  "releases" have occurred on the Site, (2) that the City has

13  determined the Site to be a "blighted property" within a

14  "blighted area" within the City's boundaries due to the release

15  of hazardous materials, (3) that the City's determination

16  followed Phase I and Phase II environmental assessments of the

17  Site, and (4) that the City provided defendants with requisite

18  notice to respond and to propose an investigation and/or cleanup

19  plan.  See id. § 25403.1(a)(1)(A).

20       Therefore, as the court reads the Gatto Act, the City

21  is entitled to enter the Site and take the necessary action to

22  clean up the contamination.  No order of this court is required

23  for the City to do so.  However, the City asks the court to go

24  further and to order defendants to do the investigation and

25  cleanup themselves.  Considering the present posture of this

26  case, the court determines that such an order would be premature

27  and impractical at this time.

28       District courts have broad discretion "to manage their

1  own affairs so as to achieve the orderly expeditious disposition

2  of cases." Dietz v. Bouldin, 136 S. Ct. 1885, 1891 (2016)

3  (quoting Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962)); see

4  also Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1087 (9th

5  Cir. 2002).  Though the court has already found defendants to be

6  liable under plaintiffs' CERCLA claim (see Docket No. 125) and

7  this Order finds them to be liable under plaintiffs' HSAA claim,

8  several of plaintiffs' claims remain outstanding, including their

9  claims under RCRA, the Porter-Cologne Water Quality Control Act,

10  California public nuisance law, California trespass law, and for

11  declaratory relief.  (See Third Am. Compl. ("TAC") (Docket No.

12  45); Docket Nos. 125, 203, 211.)  For the reasons that follow,

13  the court finds that deferring its determination as to whether

14  the City is entitled to permanent injunctive relief under the

15  Gatto Act until final resolution of those remaining claims will

16  aid in the orderly and expeditious disposition of the case.  See

17  Dietz, 136 S. Ct. at 1087.

18      Several of plaintiffs' other outstanding claims also

19  seek some form of permanent injunctive relief requiring

20  defendants to investigate and clean up the Site.  (See TAC ¶ 85

21  ("The City is entitled to injunctive relief under RCRA § 7002(a),

22  42 U.S.C. § 6972(a), compelling each defendant jointly and

23  severally to conduct a complete, timely, and appropriate

24  investigation and abatement of all actual and potential

25  endangerments arising from the presence of the Contaminants in

26  the environment at the Site, and to obtain regulatory closure of

27  the Site."); id. ¶ 144 ("Plaintiffs are entitled to injunctive

28  relief compelling defendants jointly and severally, promptly and

6

1    competently to take such action as may be necessary to abate the

2    public nuisance at the Site and to obtain regulatory closure of

3    the Site."); id. ¶ 157 ("The City is entitled to injunctive

4    relief compelling the defendants jointly and severally, promptly

5    and competently to take such action as may be necessary to abate

6    the trespass . . . .").)

7           Because injunctive relief "must be narrowly tailored to

8    remedy the specific harm shown," City and Cty. of San Francisco

9    v. Trump, 897 F.3d 1225, 1244 (9th Cir. 2018) (quoting Bresgal v.

10   Brock, 843 F.2d 1163, 1170-71 (9th Cir. 1987)), the precise

11   nature and extent of injunctive relief to which plaintiffs are

12   entitled will depend on which, if any, of those claims are

13   successful.[1]

14          For example, RCRA § 7002(a) authorizes an injunction

15   where a plaintiff can successfully show that a defendant was a

16   past or present generator of hazardous waste, contributed to the

17   handling, storage, treatment, or disposal of hazardous waste, and

18   that the hazardous waste "may present an imminent and substantial

19   endangerment to health or the environment."  See 42 U.S.C. §

20   6792(a); Meghrig v. KFC W., Inc., 516 U.S. 479, 484 (1996);

21   LAJIM, LLC v. Gen. Elec. Co., 917 F.3d 933, 943 (7th Cir. 2019).

22   California public nuisance law also authorizes injunctive relief

23   to abate a nuisance--i.e., something that is "injurious to

24   health" or "offensive to the senses"--where a plaintiff can show

25   that a defendant was a substantial factor in causing the

26

27           [1]   The court expresses no opinion in this Order as to the
     merits of any of plaintiffs' claims beyond their Gatto Act and
28   HSAA claims.

1  nuisance, that the nuisance is "substantial and unreasonable,"

2  and that the nuisance affects an entire community or neighborhood

3  at the same time.  See Cty. of Santa Clara v. Atl. Richfield Co.,

4  137 Cal. App. 4th 292, 306 (2006); Cal. Code Civ. P. § 731.

5          Thus, if defendants are found to be liable under RCRA

6  § 7002(a), and the court finds that injunctive relief is

7  warranted, the court will have to shape any injunctive relief to

8  account for the "imminent and substantial endangerment" that the

9  hazardous waste at the Site poses to health or the environment.

10  See 42 U.S.C. § 6792(a); San Francisco, 897 F.3d at 1244.  But if

11  defendants are also found to be liable under public nuisance law,

12  the injunction may take a different form, as the court will have

13  to ensure that the Site is remedied to the point that conditions

14  there are no longer "substantial and unreasonable" or "injurious

15  to health or offensive to the senses."  Santa Clara, 137 Cal.

16  App. 4th at 306.

17          Because plaintiffs' remaining claims have the potential

18  to alter the scope and extent of any eventual injunctive relief

19  in this way, the court finds that, regardless of whether the City

20  is entitled to an injunction under the Gatto Act,[2] issuing a

21          [2]   Whether the Gatto Act authorizes suits for injunctive
22  relief is not entirely clear.  Section 25323.5 of the Act
   contemplates that, in instances where a local agency "undertakes
23  action to investigate property or clean up, or to require others
   to investigate or clean up, including compelling a responsible
24  party through a civil injunctive action, a release of hazardous
   material, the responsible party shall be liable to the local
25  agency for the costs incurred in the action."  See Cal. Health &
   Safety Code §§ 25323.5(a).  One California Court of Appeals has
26  held that similar language contained in the Polanco Redevelopment
   Act, when read in concert with language authorizing redevelopment
27  agencies to take "any action" necessary to remove hazardous
   substances from properties within a redevelopment project area,
28

1    permanent injunction prior to final judgment would be premature.

2    Cf. Lincoln Props., Ltd. v. Higgins, No. S-91-760 DFL GGH, 1993

3    WL 217429 at *16 (E.D. Cal. Jan. 21, 1993) (stating that,

4    although plaintiff was entitled to injunctive relief under RCRA

5    and public nuisance law at summary judgment stage, "[t]he precise

6    nature and scope of injunctive relief shall be determined, and

7    the injunction shall issue, at a later date").

8         Moreover, issuing permanent injunctive relief at this

9

10   authorized redevelopment agencies to seek injunctive relief

11   requiring responsible parties to clean up hazardous substances on
     property within a redevelopment project area.  See Redev. Agency

12   of San Diego v. San Diego Gas & Elec. Co., 111 Cal. App. 4th 912,
     920 (2003).  This interpretation may also apply to the language in

13   the Gatto Act, inasmuch as the California Legislature has declared
     the Gatto Act to be the "policy successor to the Polanco

14   Redevelopment Act" and "that any judicial construction or
     interpretation of the Polanco Redevelopment Act also apply to [the

15   Gatto Act]."  Cal. Health & Safety Code § 25403.8.

16        On the other hand, plaintiffs do not point to, and the
     court is not aware of, any case in which a local agency has

17   obtained an injunction under the Gatto Act compelling a
     responsible party to investigate or clean up a site contaminated

18   with hazardous materials.  The Act's text and structure seem
     overwhelmingly concerned with authorizing local agencies to

19   investigate, clean up, and recover costs for contaminated sites
     themselves.  See Cal. Health & Safety Code § 25403.1-25403.5.

20   For instance, the Act imposes a number of detailed requirements
     on local agencies to ensure that their investigations and/or

21   cleanups receive California Department of Toxic Substances
     Control ("DTSC") or the appropriate regional water board

22   approval.  See, e.g., id. § 25403.1(a)(2)(B) (requiring that the
     local agency "submit an investigation plan and cost recovery

23   agreement to the regional board or the department for review and
     approval" before taking action to clean up the release); §

24   25403.1(a)(2)(C) ("After completion of the investigation plan,
     have a cleanup plan prepared by a qualified independent

25   contractor.").  These requirements would seem to be superfluous
     if local agencies were simply entitled to injunctive relief

26   compelling responsible parties to investigate and clean up the
     site instead of the agency.  However, the court does not resolve

27   that issue at this time.

28

9

juncture would be inconsistent with Orders previously issued by
the court pertaining to plaintiffs' CERCLA § 107 claim.  (See
Docket Nos. 125, 203).  Since the court has already found
defendants to be jointly and severally liable for plaintiffs'
necessary response costs under CERCLA § 107 (see id.), this Order
finds that the defendants are also liable under the HSAA, and the
City has its remedies under the Gatto Act, the City will be
entitled to enter the Site, perform its own investigation and
cleanup, and to recover the resulting costs from defendants.  See
42 U.S.C. § 9607(a); Cal. Health & Safety Code §§ 25363(d),
25403.5.  Either the City should do the cleanup or the defendants
should; to have both of them doing it at the same time would
potentially lead to chaos.  This potential conflict would more
appropriately be resolved at the time of final judgment, when the
precise scope of the plaintiffs' remedy under CERCLA and their
other claims are determined after hearing.

        IT IS THEREFORE ORDERED that plaintiffs' motion for
summary judgment on the issue of liability on their claim under
the Carpenter-Presley-Tanner Hazardous Substance Account Act,
Cal. Health & Safety Code §§ 25363(d), is hereby GRANTED;

        AND IT IS FURTHER ORDERED that plaintiffs' motion for
summary judgment on their claim for violation of the Gatto Act,
Cal. Health & Safety Code §§ 25403.1, 25403.5, is hereby DENIED.

Dated:  December 15, 2020

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

10

# EXHIBIT E

1

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                         EASTERN DISTRICT OF CALIFORNIA

11                                  ----oo0oo----

12

13   CITY OF WEST SACRAMENTO,              No. 2:18-cv-00900 WBS EFB
     CALIFORNIA; and PEOPLE OF THE
14   STATE OF CALIFORNIA,,

15              Plaintiff,

16        v.                              AMENDED FINAL PRETRIAL ORDER

17   R AND L BUSINESS MANAGEMENT,
     a California corporation,
18   f/k/a STOCKTON PLATING, INC.,
     d/b/a CAPITOL PLATING INC.,
19   a/k/a CAPITOL PLATING, a/k/a
     CAPITAL PLATING; CAPITOL
20   PLATING, INC., a dissolved
     California corporation; JOHN
21   CLARK, an individual; ESTATE
     OF NICK E. SMITH, DECEASED;
22   et al.,

23              Defendant.

24                                  ----oo0oo----

25

26          A Final Pretrial Conference was held in this matter,

27   pursuant to the provisions of Rule 16(d) of the Federal Rules of

28   Civil Procedure and Local Rule 282, on January 4, 2021.  Bret A.

                                     1

Stone appeared as counsel for plaintiffs City of West Sacramento ("the City") and the people of the State of California.  Joseph A. Salazar, Jr. appeared as counsel for defendants and third-party plaintiffs R and L Business Management fka Stockton Plating, Inc. ("R&L"), John Clark ("Clark"), and the Estate of Nick E. Smith ("Smith").[1]  Jennifer Hartman King and Alanna Lungren appeared as counsel for third-party defendant County of Yolo.  Following the conference, the court issued a Final Pretrial Order ("PTO"), directing the parties to file and serve any objections and proposed modifications to PTO the within five court days.  (Docket No. 233.)

On January 12, 2021, plaintiffs filed objections and proposed modifications to the PTO.  (Docket No. 239.)  On January 20, 2021, defendants filed a response to plaintiffs' objections and proposed modifications.  (Docket No. 243.)  The court held a hearing on those objections and proposed modifications on January 26, 2010.  Having considered plaintiffs' objections and defendants' responses, the court issues the following Amended Pretrial Order:

I.  Jurisdiction – Venue

Jurisdiction over plaintiffs' claims is predicated upon federal question, 28 U.S.C. § 1331.  Specifically, the court has federal question jurisdiction over plaintiffs' first claim under the Resource Conservation and Recovery Act ("RCRA") § 7002(a), 42 U.S.C. § 6972(a), and plaintiffs' second claim under the

---

[1]     Only defendants R and L Business Management and John Clark filed third-party claims against the County of Yolo; the Estate of Nick E. Smith is not a third-party plaintiff in this matter.

1    Comprehensive Environmental Response, Compensation and Liability

2    Act ("CERCLA") § 107(a), 42 U.S.C. § 9607(a).  The court has

3    supplemental jurisdiction over plaintiffs' other claims pursuant

4    to 28 U.S.C. § 1367.

5           Jurisdiction over third-party plaintiffs' claim is

6    predicated upon federal question, 28 U.S.C. § 1331, because their

7    claim for contribution under CERCLA § 9613(f)(1) arises under

8    laws of the United States.  Jurisdiction over third-party

9    defendant's counterclaim under CERCLA § 113(f) is likewise

10   predicated upon federal question, 28 U.S.C. § 1331.  The court

11   has supplemental jurisdiction over third-party defendant's other

12   counterclaims pursuant to 28 U.S.C. § 1367.

13          Venue is undisputed and is hereby found to be proper.

14   II.  Jury – Non-Jury

15          Plaintiffs represent that they have voluntarily

16   abandoned any claims that would require trial by jury and,

17   accordingly, have requested a bench trial.

18       A.   The City's RCRA Claim against Defendants

19          Defendants have demanded a trial by jury of the City's

20   RCRA claim, arguing that the potential availability of civil

21   penalties under RCRA § 6972(a)(1)(B) triggers the Seventh

22   Amendment right to a jury.  Defendants cite to Tull v. United

23   States, 481 U.S. 412, 418-25 (1987), where the Supreme Court held

24   that the defendant had "a constitutional right to a jury trial to

25   determine his liability" as to his claim under § 1319 of the

26   Clean Water Act because the statute provided for, and the

27   plaintiff sought, civil penalties.

28          At least one federal district court has held that,

3

1    under <u>Tull</u>, parties are entitled to a jury determination on the

2    issue of liability for civil penalties under RCRA's citizen suit

3    provision, 42 U.S.C. § 6972(a)(1)(B).   See <u>N.C. Envtl. Justice</u>

4    <u>Network v. Taylor</u>, No. 4:12-CV-154-D, 2014 WL 7384970, at *3

5    (E.D.N.C. Dec. 29, 2014).   However, plaintiffs here do not seek

6    civil penalties under RCRA.   They seek only "an injunction

7    compelling defendants to abate the imminent and substantial

8    endangerment . . . at the Site."   (See Pls.' Pretrial Statement §

9    10 (Docket No. 226).)   In fact, plaintiffs do not seek civil

10   penalties under any of their claims--the operative complaint in

11   this matter, plaintiffs' Third Amended Complaint, does not

12   mention civil penalties at all.   (See Pls.' Third Am. Compl.

13   ("TAC"), Prayer for Relief ¶¶ 1-10 (Docket No. 45).)   Because

14   there is no potential for the City to recover civil penalties in

15   this case, defendants are not entitled to a jury and the City's

16   RCRA claim will be tried before the court, sitting without a

17   jury.

18          B.   <u>Third-Party Claims under CERCLA § 113(f)</u>

19          Third-party defendant has demanded a jury trial on

20   third-party plaintiffs' claim against it for contribution under

21   CERCLA § 113(f), 42 U.S.C. § 9613(f)(1), as well as on its

22   counterclaim against third-party plaintiffs for contribution

23   under § 113(f).[2]   Third-party defendant cites <u>Cal. Dep't of Toxic</u>

24   _____

25          [2]   Two days after filing their pretrial statement, third-
     party plaintiffs filed an "Addendum" in which they indicated that
26   they "augment[ed] their request for a jury and incorporate and
     join the reasons and authorities cited by the [third-party
27   defendant] County of Yolo in its Pre-Trial Statement."   (See
     Addendum to Pre-Trial Statement (Docket No. 230).)   Though third-
28   party plaintiffs do not appear to have timely demanded a jury

                                   4

1  Substances Control v. Jim Dobbas, Inc., No. 2:14-595 WBS EFB,

2  2014 WL 4627248 (E.D. Cal. Sep. 16, 2014) for the proposition

3  that CERCLA § 113(f) provides parties with a right to a trial by

4  jury.  However, this court in Dobbas did not hold that the

5  plaintiff was entitled to a jury under CERCLA § 113(f).  Rather,

6  this court merely held that it would be inappropriate to strike

7  the plaintiff's jury demand at the pleading stage, noting that

8  the function of a Rule 12(f) motion to strike "is to avoid the

9  expenditure of time and money that must arise from litigating

10 spurious issues by dispensing with those issues prior to trial."

11 See Dobbas, 2014 WL 4627248, at *6 ((quoting Sidney-Vinstein v.

12 A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983)).

13      Because striking a jury demand at the pleading stage

14 in Dobbas would not have saved the parties any time or money, the

15 court chose to err on the side of caution and preserved the

16 plaintiff's right to demand a jury trial until the proper

17 occasion for the court to consider the issue.  See id.

18      In this case, the issue of whether the parties are

19 entitled to a jury is now squarely before the court.  The purpose

20 of a final pretrial conference to "formulate a trial plan,"

21 including whether the trial will proceed before a jury or before

22 the bench sitting without a jury.  Fed. R. Civ. P. 16(e).  Under

23 Rule 16, the court must now issue an order determining whether

24 the parties are entitled to a jury that will "control[] the

25 _____

26 trial of their claim for contribution against third-party
   defendant under Rule 38 (see Am. Third-Party Compl. (Docket No.

27 116)), they do appear to have timely demanded a jury trial on
   third-party defendant's counterclaim (see Answer to Counterclaim

28 (Docket No. 142)).  See Fed. R. Civ. P. 38.

1  course of the action before it . . . ." Id.; see also Dream

2  Games of Ariz. v. PC Onsite, 561 F.3d 983, 996 (9th Cir. 2009)

3  (stating that, to prevent prejudice, parties are typically bound

4  by the pretrial order which "control[s] the subsequent course of

5  action unless modified" (quoting Fed. R. Civ. P. 16(e)); Pradier

6  v. Elespuru, 641 F.2d 808, 811 (9th Cir. 1981) ("The parties are

7  entitled to know at the outset of the trial whether the decision

8  will be made by the judge or the jury.").

9          In the only appellate decision to have squarely

10 addressed the issue, Hatco Corp. v. W.R. Grace & Co. Conn., the

11 Third Circuit held that parties are not entitled to a jury trial

12 in suits brought under CERCLA § 113(f).  See 59 F.3d 400, 414 (3d

13 Cir. 1995).  The court reasoned that, because the "precipitating

14 claims under section 9607 are [also] primarily equitable in

15 nature," and because § 9613(f)(1) requires courts to apportion

16 costs between the parties "using such equitable factors as the

17 court determines are appropriate," a claim for contribution under

18 § 113(f) is essentially an equitable claim, under which no right

19 to a jury exists.  See id. at 412-414 (citing United States v.

20 Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726 (8th Cir.

21 1987) for the proposition that no right to a jury exists under

22 CERCLA § 107).

23          This court agrees with the Third Circuit's reasoning.

24 In particular, the court is persuaded that the statute's use of

25 the term "equitable factors as the court determines are

26 appropriate" is evidence that Congress--who was well aware that

27 juries were not traditionally a feature of equitable trials--

28 likely intended to design a "flexible" remedy that would track

6

1  traditional equity practice and would "be based on circumstances

2  not cognizable in nor readily adapted to an action at law."  See

3  id.; 42 U.S.C. § 9613(f)(1).

4         The court further notes that the vast majority of

5  district courts to have considered the question have also found

6  that no right to a jury exists under CERCLA § 113(f).  See, e.g.,

7  Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc., 217 F.

8  Supp. 2d 1028, 1047 (C.D. Cal. 2002); Zuckerman, Bois II &

9  Johnson, Common law toxic tort actions--Background, Envtl.

10 Liability Allocation L. & Prac. § 9:2 n.4 (2020-2021) (noting

11 that Hatco's holding that no jury trial is available under CERCLA

12 § 113(f) "has . . . been universally accepted").  In fact, the

13 court has not found a single example of a case in which a

14 district court has tried a CERCLA § 113(f) claim before a jury

15 since the Third Circuit's decision in Hatco.

16        When asked at the final pretrial conference to

17 identify case law in support of the proposition that § 113(f)

18 provides the right to a jury trial beyond the district court's

19 ruling in Dobbas, third-party defendant pointed only to footnote

20 9 in Hatco, which cites to three district court cases for the

21 proposition that "district courts have reached conflicting

22 results on the issue."  See Hatco, 59 F.3d at 412 n.9 (citing

23 American Cyanamid Co. v. King Indus., Inc., 814 F. Supp. 209,

24 213-15 (D.R.I. 1993); Wehner v. Syntex Corp., 682 F. Supp. 39,

25 39-40 (N.D. Cal. 1987); United States v. Shaner, No. 85-1372,

26 1992 WL 154618, at **2-4 (E.D. Pa. June 15, 1992)).

27        Only one of those cases actually held that CERCLA § 113

28 provides parties with the right to a jury trial, see Shaner, 1992

WL 154618, at *3 ("[T]he Court concludes that CERCLA § 113 contribution actions are legal in nature and thus create an implicit right to jury trial."), and that decision was implicitly overruled when the Third Circuit unequivocally held that claims brought pursuant to CERCLA § 113(f) are equitable in nature and do not provide a right to a jury trial.  See Hatco, 59 F.3d at 414.

Therefore, because the court agrees with the Third Circuit's reasoning in Hatco, and because there does not appear to have been any intervening change in law since that decision was issued, the court finds that the parties are not entitled to a jury trial under CERCLA § 113(f).  Third-party plaintiffs' and third-party defendant's claims for contribution under CERCLA § 113(f) will therefore be tried before the court, sitting without a jury.[3]

_____

[3]   The fact that both parties to defendant's claims for contribution have demanded a jury trial under § 113(f) does not change the court's analysis.  Under Federal Rule of Civil Procedure 39(c)(2), in "an action not triable of right by a jury, the court, on motion or on its own may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right, unless the action is against the United States and a federal statute provides for a nonjury trial."  While this Rule "permits both sides to stipulate to a jury trial . . . a district court does not have to go along with the stipulation."  Hildebrand v. Board of Trustees of Mich. State Univ., 607 F.2d 705, 711 (6th Cir. 1979) (citing Fed. R. Civ. P. 39(c)); Merex A.G. v. Fairchild Weston Systems, Inc., 29 F.3d 821, 827 (2d Cir. 1994) ("[W]hen both parties consent, Rule 39(c) invests the trial court with the discretion--but not the duty--to submit an equitable claim to the jury for a binding verdict.  While the litigants are free to request a jury trial on an equitable claim, they cannot impose such a trial on an unwilling court."); Universal Elecs., Inc. v. Universal Remote Control, No. SACV 12-00329 AG (JPRx), 2014 WL 12587050 (C.D. Cal. Dec. 16, 2014) (same) (citing Merex, 29 F.3d at 827)).

1      C.    Third-Party Defendant's Public Nuisance Counterclaim

2           The only remaining claim for which a party has demanded

3      a jury trial is the third-party defendant's counterclaim against

4      third-party plaintiffs for damages under California public

5      nuisance law.  No party has presented any argument that the

6      county is not entitled to a jury on this claim.

7           The court will not be able to empanel a jury in March

8      of 2021 due to the COVID-19 pandemic.  The pandemic has caused

9      our courthouse to be closed to the public since March of 2020.

10     See Eastern District of California General Orders 611, 612, 618.

11     Now, nearly ten months later, it is fair to say that the

12     circumstances necessitating the closure have only gotten worse.

13     At this point in time it is impossible to predict with any degree

14     of confidence when this court will be able to begin jury trials

15     again, and when jury trials do resume criminal cases will have to

16     take precedence over civil cases such as this one.[4]

17          Accordingly, the trial of the claims between third-

18     party plaintiffs and third-party defendant will be postponed and

19     reset at a subsequent date, if and when the court is able to

20          In light of the fact that Congress, in enacting CERCLA

21     § 113(f), intended to provide the court with a flexible remedy
       under which it could apply such equitable factors as it

22     determines are appropriate, see Hatco, 59 F.3d at 412-14, and in
       light of the present unavailability of jury trial due to the

23     COVID-19 pandemic, see section II.C, infra, the court will not
       exercise its discretion under Rule 39(c) to try the parties'

24     equitable claims for contribution under § 113(f) to a jury.  See
       Merex, 29 F.3d at 827.

25          [4]   For a discussion of the difficulties in even attempting

26     to empanel a jury in this district under the current
       circumstances, see this court's Order in United States v. Sheikh,

27     No. 2:18-CR-00119 WBS, 2020 WL 5995226, at **1-2 (E.D. Cal. Oct.
       9, 2020).

28

                                    9

1    resume jury trials in civil cases.  See Fed. R. Civ. P. 42(b)

2    (authorizing the court to order a separate trial of one or more

3    separate issues, claims, crossclaims, counterclaims, or third-

4    party claims "[f]or convenience, to avoid prejudice, or to

5    expedite or economize").[5]

6    III.  Proposed Findings of Fact and Conclusions of Law and Form of

7           Judgment

8           No later than fourteen court days before the trial

9    date, plaintiffs shall lodge and serve the Findings of Fact and

10   Conclusions of Law and form of judgment which they propose to be

11   entered at the conclusion of the trial pursuant to Federal Rule

12   of Civil Procedure 52.  No later than seven court days before

13   trial, defendants shall lodge and serve the Findings of Fact and

14   Conclusions of Law and form of judgment which they propose be

15   entered.

16   IV.  Trial Briefs

17          According to the briefing schedule listed below, the

18   parties shall submit briefs on the following issue: whether,

19   during a trial solely of the claims brought by plaintiffs against

20   defendants (i.e., excluding the third-party claims under CERCLA §

21   113(f) for contribution brought by third-party plaintiffs and

22   third party defendant), the court will have to consider the

23

24          [5]    If third-party defendant County of Yolo decides to
     withdraw its demand for a jury trial on its public nuisance claim
25   and notifies the court and the other parties by January 8, 2021,
     the court will try the third-party claims between defendants and
26   the County of Yolo at the same time that it tries plaintiffs'
     claims against defendants, on March 9, 2021.  Should third-party
27   defendant withdraw its demand for a jury trial, the court will
     amend this Pretrial Order accordingly.
28

1    question of how to equitably apportion cleanup costs between the

2    defendants and all other parties, including predecessors at the

3    Site and third-party defendant County of Yolo.

4           • January 14, 2021: Deadline for defendants R&L,

5              Smith, and Clark, as well as third-party defendant

6              County of Yolo, to submit their opening briefs

7           • January 21, 2021: Deadline for plaintiffs to submit

8              their response brief

9           • January 26, 2021, at 10:00 a.m.: Hearing on the

10             parties' briefs, to be conducted over Zoom

11          No later than fourteen calendar days before the trial

12   date, counsel for each party shall file any additional trial

13   briefs pursuant to Local Rule 285.  Because this action is to be

14   tried before the court sitting without a jury, motions in limine

15   are not appropriate.  However, counsel may alert the court to any

16   legal issues they anticipate will need to be addressed in their

17   respective trial briefs.  No later than five court days before

18   trial, the parties may file responses to the other side's trial

19   briefs.

20   V.   Remaining Claims

21          In addition to their CERCLA claim, plaintiffs assert a

22   claim under California public nuisance law against defendants

23   R&L, Smith, and Clark.  The City also asserts a claim under the

24   Porter Cologne Water Quality Control Act, Cal. Water Code §

25   13304(c), against R&L, Smith, and Clark.  The parties agree that

26   only the causation element of each claim remains to be tried

27   along with the remedies of injunctive relief on the nuisance

28   claim and cost recovery on the Porter-Cologne Act claim.

1        The City also asserts claims under RCRA, 42 U.S.C.

2  § 6972(a)(1)(B), and the Gatto Act, Cal. Health & Safety Code §§

3  25403.1, 25403.5, against R&L and Smith.  The parties agree that

4  the only remaining element of the City's RCRA claim that remains

5  to be tried is the presence of an imminent and substantial

6  endangerment to human health or the environment along with the

7  remedy of injunctive relief.  See 42 U.S.C. § 6972(a)(1)(B).  The

8  parties also agree that the only aspects of the City's Gatto Act

9  claim that remain to be tried are the remedies of cost recovery

10 and injunctive relief.  See Cal. Health & Safety Code §§ 25403.1,

11 25403.5.

12       The court has already ruled that defendants are jointly

13 and severally liable to the City under CERCLA § 107(a).  (See

14 Docket No. 125.)  The parties disagree as to whether the court

15 still must determine the defendants' equitable share of the

16 cleanup costs as to other parties, including predecessors at the

17 Site and third-party defendant County of Yolo, prior to the trial

18 of the third-party claims between defendants and the County.  If

19 the court is satisfied, based on the parties' briefing, see

20 section IV, supra, that the court must equitably apportion

21 cleanup costs prior to trial of the third-party claims, it will

22 do so at the trial between plaintiffs and defendants on March 9,

23 2021.

24       The court has also ruled that defendants are liable

25 under the Carpenter-Presley-Tanner Hazardous Substance Account

26 Act ("HSAA"), Cal. Health & Safety Code § 25363(d).  (See Docket

27 No. 225.)  The court must still determine the amount of costs to

28 which the City is entitled under CERCLA § 107 and the HSAA.

1          The parties agree that there are no issues remaining to

2    be tried on the City's declaratory relief claim against defendants

3    under CERCLA § 113(g)(2).  The court's findings after trial will

4    therefore include a judgment declaring that defendants are liable to

5    the City under CERCLA § 113(g)(2) in any subsequent action for

6    recovery of response costs the City incurs in the future.  Any

7    defenses to the amount or the nature of any response costs,

8    including whether those responses costs were incurred consistent

9    with existing law, are reserved for an appropriate time.

10          The parties agree that plaintiffs have abandoned their

11   trespass and ultrahazardous activity claims against defendants,

12   as well as their prayer for damages under their public nuisance

13   claim.

14          There is one party in default, Urban Farmbox, LLC.  As

15   plaintiffs represent that little evidence is needed for prove-up,

16   the court will permit evidence as to Urban Farmbox's liability to

17   be presented at trial, rather than at a separate hearing or

18   through motion practice after trial.

19          Defendants, as third-party plaintiffs, assert a claim

20   for contribution against third-party defendant under CERCLA

21   § 113(f), 42 U.S.C. § 9613(f)(1).  Third-party defendant asserts

22   counterclaims for contribution against third-party plaintiffs

23   under CERCLA § 113(f), 42 U.S.C. § 9613(f)(1), and the HSAA, Cal.

24   Health & Safety Code § 25363(d), and common law contribution and

25   indemnity, as well as counterclaims against third-party

26   plaintiffs under California law for continuing public nuisance,

27   negligence, and negligence per se.  As discussed above, see

28   section II.C, supra, the court will try these third-party claims

                                    13

1  separately, at a later date.

2       Accordingly, plaintiffs' claims against defendants

3  under (1) California public nuisance law; (2) the Porter-Cologne

4  Water Quality Control Act; (3) RCRA; and (4) the Gatto Act will

5  be tried on March 9, 2021.  The court will also determine the

6  amount of costs to which plaintiffs are entitled under CERCLA

7  § 107 and the HSAA § 25363(d), enter an order granting

8  declaratory relief under CERCLA § 113(g)(2), determine

9  defendants' equitable share of the cleanup costs as to

10  predecessors and the County of Yolo (if warranted), and hear

11  plaintiffs' evidence regarding Urban Farmbox, LLC's default at

12  the March 9th trial.  All third-party claims between defendants

13  and third-party defendant Yolo County under CERCLA § 113, the

14  HSAA, common law contribution and indemnity, public nuisance,

15  negligence, and negligence per se will be postponed and tried

16  separately, at a later date.

17  VI.  <u>Witnesses</u>

18       (A)  Plaintiffs anticipate calling the witnesses

19  identified at Exhibit "A" attached hereto.

20       (B)  Defendants and Third-Party Plaintiffs R&L, Clark,

21  and Smith anticipate calling the witnesses identified at Exhibit

22  "B" attached hereto.

23       (C)  Third-party Defendant County of Yolo anticipates

24  calling the witnesses identified at Exhibit "C" attached hereto.

25       (D)  Except for retained experts, each party may call

26  any witness designated by any other party.

27       (E)  No other witnesses will be permitted to testify at

28  trial unless:

14

1              (1)   all parties stipulate that the witness may
2    testify;
3              (2)   the party offering the witness demonstrates
4    that the witness is for the purpose of rebutting evidence which
5    could not have been reasonably anticipated at the time of the
6    Pretrial Conference; or
7              (3)   the witness was discovered after the Pretrial
8    Conference.
9         (F)   Testimony of a witness not designated in this
10   Order, which is offered under paragraph VI(E)(3), above, upon the
11   grounds that the witness was discovered after the Pretrial
12   Conference, will not be permitted unless:
13             (1)   the testimony of the witness could not
14   reasonably have been discovered prior to the Pretrial Conference;
15             (2)   the court and opposing counsel were promptly
16   notified upon discovery of the testimony; and
17             (3)   counsel proffered the witness for deposition
18   if time permitted or provided all opposing counsel a reasonable
19   summary of the testimony if time did not permit a deposition.
20        (G)   Plaintiffs and defendants have agreed to submit
21   Dr. Adam Love and Dr. Anne Farr's CVs and/or resumes to the court
22   in lieu of establishing their qualifications via testimony at
23   trial.
24   VII.  <u>Exhibits</u>
25             (A)   Plaintiffs intend to offer the exhibits identified
26   at Exhibit "D" attached hereto.
27             (B)   Defendants and Third-Party Plaintiffs R&L, Clark,
28   and Smith intend to offer the exhibits identified at Exhibit "E"

15

1    attached hereto.

2              (C)   Third-party Defendant County of Yolo intends to

3    offer the exhibits identified at Exhibit "F" attached hereto.

4              (D)   Each party may offer any exhibit designated by any

5    other party.

6              (E)   No other exhibits will be received in evidence

7    unless:

8                    (1)   all parties stipulate that the exhibit may be

9    received in evidence;

10                   (2)   the party offering the exhibit demonstrates

11   that the exhibit is for the purpose of rebutting evidence which

12   could not have been reasonably anticipated at the time of the

13   Pretrial Conference; or

14                   (3)   the exhibit was discovered after the Pretrial

15   Conference.

16             (F)   An exhibit not designated in this Order, which is

17   offered under paragraph VII(E)(3), above, upon the grounds that

18   the exhibit was discovered after the Pretrial Conference, will

19   not be received in evidence unless:

20                   (1)   the exhibit could not reasonably have been

21   discovered prior to the Pretrial Conference;

22                   (2)   the court and opposing counsel were promptly

23   notified upon discovery of the exhibit; and

24                   (3)   counsel provided copies of the exhibit to all

25   opposing counsel if physically possible or made the exhibit

26   reasonably available for inspection by all opposing counsel if

27   copying was not physically possible.

28             (G)   Each party shall exchange copies of all exhibits

16

identified in this Order, or make them reasonably available for inspection by all other parties, no later than seven calendar days before the trial date.  Any and all objections to such exhibits shall be filed and served not later than four calendar days before the trial date.

(H)  The attorneys for plaintiffs and defendants are directed to submit an electronic copy of each exhibit to Deputy Clerk Karen Kirksey Smith at 8:30 a.m. on the date of trial.  As discussed at the final pretrial conference, the parties are also directed to submit physical copies of (1) any exhibit a witness is likely to be asked about, (2) each witness' own deposition transcript, and (3) if the witness testified at the evidentiary hearing on divisibility, a transcript of their testimony to that witness in advance of trial.

(I)  Each exhibit which has been designated in this Order and presented on the morning of the date of trial shall be pre-marked by counsel.  Plaintiffs' exhibits shall bear numbers; defendants and third-party plaintiffs' exhibits shall bear letters; third-party defendants' exhibits shall bear numbers beginning with number 301.  If no objection has been made to such exhibit pursuant to paragraph VII(F), above, such exhibit will require no further foundation and will be received in evidence upon the motion of any party at trial.

VIII.  <u>Further Discovery and Motions</u>

No further motions shall be brought before trial except upon order of the court and upon a showing of manifest injustice.  Fed. R. Civ. P. 16(e).  No further discovery will be permitted except by the express stipulation of all parties or upon order of

17

1  the court and upon a showing of manifest injustice.   Id.

2  IX.  Date and Length of Trial

3         The trial is set for March 9, 2021 at 9:00 AM.  The

4  trial on plaintiffs' claims will occur via videoconference over

5  Zoom.  The court estimates that trial will last approximately 3

6  to 4 court days.

7  X. Settlement

8         The parties are willing to participate in a pretrial

9  settlement conference.  Accordingly, a settlement conference is

10 set before Magistrate Judge Edmund F. Brennan on February 11,

11 2021, at 10:00 a.m. via Zoom.  Further information regarding

12 appearances at the settlement conference will be provided by the

13 courtroom deputy for Magistrate Judge Brennan.  Each party is

14 ordered to have a principal with full settlement authority

15 present at the settlement conference or to be fully authorized to

16 settle the matter on any terms.

17        No later than 12:00 p.m. on February 4, 2021, counsel

18 for each party shall submit a Confidential Settlement Conference

19 Statement via email to EFBorders@caed.uscourts.gov.  The parties

20 may agree, or not, to serve each other with the Confidential

21 Settlement Conference Statements.  The Confidential Settlement

22 Conference Statements shall not be filed with the clerk and shall

23 not otherwise be disclosed to the trial judge.  However, each

24 party shall e-file a one-page document entitled "Notice of

25 Submission of Confidential Settlement Conference Statement."

26 XI.  Objections to Pretrial Order

27        Any objections or suggested modifications to this

28 Pretrial Order shall be filed and served within five court days

18

1  from the file-stamped date of this Order.  All references herein
2  to the date of this Order shall refer to the date the tentative
3  order is filed and not to the date any amended order is filed.
4  If no objections or modifications are made, this Order will
5  become final without further order of the court and shall control
6  the subsequent course of the action, pursuant to Rule 16(e) of
7  the Federal Rules of Civil Procedure.

8  Dated:  January 26, 2021

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1              Exhibit A: Plaintiffs' Witnesses

2    1.    Aaron Laurel – City of West Sacramento City Manager

3    2.    Anne Farr, Ph.D. – expert

4    3.    Andrew Reimanis – expert

5    4.    Dan Gallagher - expert

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    <u>Exhibit B: Defendants and Third-Party Plaintiffs' Witnesses</u>

2    1.   Dr. Adam Love

3    2.   Dr. Anne Farr

4    3.   Daniel Gallagher

5    4.   Andrew Reimanis

6    5.   Aaron Laurel

7    6.   John Clark

8    7.   Richard Leland

9    8.   Diane Richards

10   9.   Heather Lanctot

11   10.  Joseph Turner

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Exhibit C: Third-Party Defendant's Witnesses</u>

1.   Joseph   Turner,   PG,   CHG   –   County's   Expert,   Geosyntec
     Consultants  Inc.,  3043  Gold  Canal  Drive,  Suite  100,  Rancho
     Cordova, CA 95670

2.   Heather Lanctot – County's Person Most Knowledgeable

22

Exhibit D: Plaintiffs' Exhibits

1. Plaintiffs incorporate the exhibits already admitted into evidence at the evidentiary hearing as identified by the court.  (Dkt. No. 193-1.)

2. Regular Meeting of the City of West Sacramento City Council, Redevelopment Successor Agency, and West Sacramento Financing Authority Minutes dated October 18, 2017 (WESTSAC0020406-20408)

3. Notice of Endangerment to R and L Business Management dated October 27, 2017 (WESTSAC0020398-20401)

4. Notice of Endangerment to Nick E. Smith, Deceased *ex rel*. Royal Insurance Company dated October 27, 2017 (WESTSAC0020402-20405)

5. SWCRB Memo re PFAS at chrome plating shops (SWCRB0000001-27)

6. DTSC Imminent and Substantial Endangerment Determination and Order and Remedial Action Order dated May 6, 2020

7. Letter from R&L to DTSC re Imminent and Substantial Endangerment Determination and Order and Remedial Action Order dated June 26, 2020

8. Health Based Risk Assessment with PRGs and Fate and Transport Evaluation for Former Capitol Plating Facility by Clint Skinner Ph.D. dated September 18, 2001 (DTSC0002231-2348)

9. Resume of Andrew Reimanis

10. The City's invoices relating to investigating the Site and protecting the public

11. Yolo County Recorder Documents related to Property ownership

12. The Installment Note for the Property

1

2       <u>Exhibit E: Defendants and Third-Party Plaintiffs' Exhibits</u>

3              Defendants represent that they do not intend to

4   introduce any evidence beyond that introduced at the evidentiary

5   hearing in their defense against the City's claims.

6              As to their claim against third-party defendant, third-

7   party plaintiffs incorporate their exhibits offered in opposition

8   to third-party defendant's motion for summary judgment by

9   reference.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

Exhibit F: Third-Party Defendant's Exhibits

3

1.   Property ownership documents and parcel maps for 305, 317,

4
     and 319 3rd Street, and 221/ 225 C Street

5

2.   Expert and Rebuttal Reports of Anne Farr (City)

6

3.   Expert and Rebuttal Reports of Adam Love (R&L)

7

4.   Rebuttal Expert Report of Joseph Turner (County)

8

5.   To the extent the Exhibits submitted in the briefing of the

9
     County's   Motion   for   Summary   Judgment   (ECF   207),   and

10
     Opposition  thereto  (ECF 213),  are  not  listed  above,  the

11
     County includes:

12
     a)   Exhibits  to  Declaration  of  Jennifer  Hartman  King  in

13
          Support of Motion for Summary Judgment (ECF 207-5)

14
     b)   Exhibits to Declaration of Alanna Lungren in Support of

15
          Motion for Summary Judgment (ECF 207-6)

16
     c)   Exhibits A through E of R&L's Opposition to County of

17
          Yolo's Motion for Summary Judgment (ECF 213-3 – 213-8)

18

6.   2000 Advanced GeoEnvironmental, Inc., Additional Subsurface

19
     Investigation

20

7.   2004  URS,  Former  Capitol  Plating  Site  –  Site  Summary

21
     Investigation Report

22

8.   2004 URS, Former Capitol Plating Site - Preliminary Cost

23
     Analysis Report

24

9.   2006  Wallace  Kuhl  &  Associates  Inc.,  Shallow  Soil

25
     Investigation Report of Findings

26

10.  2007  Wallace  Kuhl  &  Associates  Inc.,  All  Appropriate

27
     Inquiries Report

28

11. 2007 Kleinfelder, Sampling and Analysis Plan – Phase II Environmental Site Assessment Washington Firehouse

12. 2008 Kleinfelder, Phase II Environmental Assessment Report – Firehouse Block Site

13. 2010 Department of Toxic Substances Control, Draft Report – Phase II Environmental Assessment Report Firehouse Block Site

14. 2020 Roux, Sampling and Analysis Plan (and subsequent revised sampling maps)

15. 2020 DTSC, Imminent and Substantial Endangerment Determination and Order and Remedial Action Order